**UNITED STATES of America, Plaintiff-Appellant,**

**v.**

**Darrel Paterson SIMPSON, Robert Macriner Anderson, and James Roy Freeman, Defendants-Appellees.**

**No. 84–5301.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 1986.

Decided April 3, 1987.

---

J. Brendan O'Neill and Joshua C. Needle, Santa Monica, Cal., and Donald Etra, Charles Pereyra-Suarez, Joan Howarth, Paul Hoffman, Los Angeles, Cal., for defendants-appellees.

James D. Henderson and D. Blair Watson, Los Angeles, Cal., for plaintiff-appellant.

Luis S. Katz, San Diego, Cal., Ephraim Margolin, Los Angeles, Cal., for the amicus.

Before HUG, NORRIS and HALL, Circuit Judges.

NORRIS, Circuit Judge:

In 1983 the FBI employed Helen Miller as an informant in an investigation of defendant Darrel Simpson, then a suspected heroin dealer. At that time, Miller was known by the FBI to be a prostitute, a heroin user, and a fugitive from Canadian drug charges. Posing as stranded travelers at the Los Angeles International Airport, Miller and a fellow informant, Karen Eccles, enticed Simpson into giving them a ride into town. They ended up at Simpson's apartment where they partied with Simpson and a friend, Tom Marino. Shortly thereafter Miller and Simpson became sexually intimate. In due course Miller introduced Simpson to "friends" who she said were interested in buying heroin. The "friends" were in fact FBI undercover agents. After a deal went down, Simpson and his two co-defendants, Robert Anderson and James Freeman, were arrested and indicted on various drug charges.

After an eight-day evidentiary hearing, the district court dismissed the indictment on the ground that the FBI's conduct in recruiting and using Miller as an informant was so offensive that it violated the due process clause of the Fifth Amendment. In his ruling, Judge Hatter relied upon Chief Justice Rehnquist's oft-quoted dictum in *United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1642-43, 36 L.Ed.2d 366 (1973), that the Supreme Court "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." Judge Hatter found that the following conduct,

taken as a whole, was outrageous: first, "the Government's manipulation of Helen Miller into becoming an informant;" second, "the Government's continued employment of Miller despite her known status as a heroin addict and prostitute, and despite her numerous arrests;" and third, "the Government's continued use of Miller as an informant after learning of her sexual involvement with Darrel Simpson." *Findings of Fact and Conclusions of Law Dismissing the Indictment on Due Process Grounds* ("*Findings*"), at 3. Judge Hatter concluded that the "Government cannot be permitted to stoop to these depths to investigate suspected criminal offenders" and that the government must be "den[ied] the fruits of its heinous acts." *Id.* at 4.

Judge Hatter also suppressed evidence obtained from FBI wiretaps of Simpson's home telephone and several public telephones he regularly used. Judge Hatter found that the affidavit supporting the wiretap application contained both material misrepresentations and omissions and that, when corrected, the affidavit failed to indicate that wiretapping was "necessary" as required by 18 U.S.C. § 2518.

The dismissal of the indictment is a final decision appealable under 28 U.S.C. § 1291.[1] We reverse the order dismissing the indictment, but we affirm the order suppressing the wiretap evidence.

**I**

**THE DUE PROCESS ISSUE**

We agree with Judge Hatter that Chief Justice Rehnquist's dictum in *Russell* left the door open to a due process claim when the conduct of law enforcement officers is "'so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Ramirez*, 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan*, 548 F.2d 782, 789 (9th Cir.), *cert. denied*, 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). *See Moran v. Burbine*, —— U.S. ——, 106 S.Ct. 1135, 1147, 89 L.Ed.2d 410 (1986) ("We do not

---

1. We reject the defendants' argument that this court lacks jurisdiction because the government's notice of appeal was not timely. The government filed a timely motion for reconsideration which tolls the time period for filing a notice of appeal. 18 U.S.C. § 3731 (1982); *see United States v. Jones*, 608 F.2d 386, 390 (9th Cir.1979).

question that [in certain circumstances] ... police deception might rise to a level of a due process violation."). Our circuit has continued to entertain complaints by defendants that their outrageous treatment by law enforcement officers warrants dismissal of their indictment. *See, e.g., United States v. Bogart,* 783 F.2d 1428, 1431–33 (9th Cir.) (discussing history of the doctrine's evolution and application in the Ninth Circuit), *vacated on other grounds with respect to one defendant sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986). However, we have acknowledged that "the due process channel which *Russell* kept open is a most narrow one." *Ryan,* 548 F.2d at 789.

Three discrete aspects of the FBI's investigation of Simpson prompted Judge Hatter to conclude that when "taken as a whole" the FBI conduct here violated due process: (1) the FBI's "manipulation" of Miller into becoming an informant; (2) the FBI's continued use of Miller as an informant after learning that she had become sexually involved with Simpson; and (3) the FBI's continued use of her after learning that she was still involved in unrelated criminal activity. After reviewing each of these aspects of the FBI's conduct, we conclude that the conduct was not so outrageous as to justify dismissal of the indictment on due process grounds.[2]

### A

### THE CONTINUED USE OF AN INFORMANT WHO HAS SEX WITH THE SUSPECT

We consider first whether the FBI's continued use of Miller as an informant after learning of her sexual involvement with Simpson raises due process concerns. Judge Hatter found that Miller, acting on instruction by the FBI, pretended to be a close personal friend of Simpson's for a period of over five months. During that time Miller had sex with him on a regular basis.[3] *Findings,* at 2–3. Simpson argues that Miller's use of sex to deceive him into believing she was an intimate friend just so she could lure him into selling heroin to undercover FBI agents constituted an outrageous invasion of his constitutionally protected realms of privacy and autonomy. Although we do not necessarily condone this investigatory tactic, we hold that the government's conduct was not so shocking as to violate the due process clause.

We recognized in *Bogart* that the outrageous conduct doctrine bars prosecution of defendants in "that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant." 783 F.2d at 1435; *see also United States v. Kelly,* 707 F.2d 1460, 1476 n. 13 (D.C.Cir.) (per curiam) (citing cases), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983). This case law evolved from the *Russell* Court's citation to *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), as an example of activity which shocks the conscience. 411 U.S. at 432, 93 S.Ct. at 1643. In *Rochin,* police officers broke into the defendant's bedroom, attempted to pull drug capsules from his throat, and finally forcibly pumped his stomach to retrieve the capsules. The Supreme Court found these

2. We review the dismissal of an indictment on due process grounds *de novo. United States v. Williams,* 791 F.2d 1383, 1386 (9th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). Defendants suggest that "[t]o the extent that Judge Hatter's dismissal was based on the court's inherent supervisory powers, the standard of review is abuse of discretion." *Appellees' Joint Brief,* at 32. If Judge Hatter had invoked the supervisory power to dismiss the indictment, then abuse of discretion would indeed be the applicable standard of review. *See United States v. Sears, Roebuck and Co.,* 719 F.2d 1386, 1395 n. 2 (9th Cir.1983) (Norris, J., dissenting in part), *cert. denied,* 465 U.S. 1079, 104 S.Ct. 1441, 79 L.Ed.2d 762 (1984); *cf. In re*

*Kiefaber,* 774 F.2d 969, 974 (9th Cir.1985) (exercise of supervisory power to quash grand jury subpoena reviewed for abuse of discretion). However, Judge Hatter did not invoke the court's supervisory power; rather, he explicitly predicated dismissal upon the due process clause. *Findings,* at 1.

3. Both Miller and Simpson admit that they engaged in sexual foreplay, but the testimony is in conflict as to whether they also engaged in sexual intercourse. Judge Hatter found it unnecessary to resolve this question in the testimony, and we too find the precise details of their sexual relationship immaterial to our holding.

law enforcement methods "too close to the rack and the screw to permit of constitutional differentiation." 342 U.S. at 172, 72 S.Ct. at 209. Relying on *Rochin*, we similarly found that the government's conduct violated due process when border patrol officers forcibly removed narcotics packets from a defendant's rectum while he was handcuffed and held spreadeagled across the table by other officers. *Huguez v. United States*, 406 F.2d 366, 381 (9th Cir. 1968). In contrast to these cases, we have rejected due process challenges to highly intrusive searches for contraband secreted in body cavities and to forced physical treatment to recover swallowed contraband in contexts where these actions were undertaken without "coercion, violence, or brutality to the person." *Irvine v. California*, 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1954) (distinguishing *Rochin*); *see, e.g., Blefare v. United States*, 362 F.2d 870 (9th Cir.1966) (rejecting outrageous conduct challenge to insertion of tube into defendant's stomach to force him to vomit swallowed drug capsules when pain was limited and procedure was performed by licensed physician); *see also Kelly*, 707 F.2d at 1476 ("The requisite level of outrageousness ... is not established merely upon a showing of obnoxious behavior or even flagrant misconduct on the part of the police; [due process] is not transgressed absent 'coercion, violence or brutality to the person.'") (quoting *Irvine*, 347 U.S. at 133, 74 S.Ct. at 383).

We acknowledge that Simpson may have suffered severe emotional trauma and felt stripped of his dignity upon learning that Miller's apparent affection for him was contrived and designed to hasten his downfall. However, because Simpson's treatment by Miller falls short of the brutality and coercion underlying previous successful outrageous conduct challenges and the government cannot be assigned responsibility for his treatment as easily as it could in these successful challenges, we decline to find a due process violation on these unique facts.

First, the deceptive creation and/or exploitation of an intimate relationship does not exceed the boundary of permissible law enforcement tactics. We have recognized that "the government may use artifice and strategem to ferret out criminal activity," *Ramirez*, 710 F.2d at 541, and to that end informants must be permitted to use deceit by "assum[ing] identities that will be convincing to the criminal elements they have to deal with." *United States v. Marcello*, 731 F.2d 1354, 1357 (9th Cir.1984). The betrayed suspect might feel foolish or insulted but cannot complain of government impropriety based on the use of deception alone. And, Simpson does not claim that he was physically or psychologically coerced into developing a close relationship with Miller. Indeed, as evidenced by the ease with which Miller befriended Simpson upon his arrival at the airport, Simpson seems to have been quite willing to become sexually and emotionally involved with her. The due process clause does not protect Simpson from voluntarily reposing his trust in one who turns out to be unworthy of it.

Second, we have great difficulty with Simpson's theory that Miller's use of sex in creating the deceptive relationship rendered his treatment outrageous as a matter of law. To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the suspect. In a particular case the informant might perceive a need to establish a physical as well as emotional bond with the suspect. We see no principled way to identify a fixed point along the continuum from casual physical contact to intense physical bonding beyond which the relationship becomes "shocking" when entertained by an informant. Rather, any attempt to distinguish between holding hands, hugging, kissing, engaging in sexual foreplay, and having sexual intercourse on a regular basis in order to decide when an informant has "gone too far" would require us to draw upon our peculiarly personal notions of human sexuality and social mores. The Supreme Court has rightly indicated that the outrageous conduct doctrine ought not be applied in so subjective a manner, admonishing us not to

condemn or condone government behavior by "draw[ing] on our merely personal and private notions and disregard[ing] the limits that bind judges in their judicial function." *Rochin,* 342 U.S. at 170, 72 S.Ct. at 208.

Simpson and *amicus curiae* American Civil Liberties Union suggest that even if Miller's deceptive use of sex is not shocking by itself, her illusory cultivation of emotional intimacy coupled with her sexual charade so magnified the invasion of Simpson's privacy and autonomy interests that prosecution should be barred. *See Separate Brief of Appellee Simpson,* at 6; *Brief of Amicus Curiae, The American Civil Liberties Union,* at 34–37 & n. 25. However, we refuse to draw fine lines based on the level of emotional intimacy inhering in a particular informant-suspect relationship. First, we note that law enforcement agents may recruit family members as informants to help investigate their relatives without violating the due process clause. *See, e.g., United States v. Penn,* 647 F.2d 876, 880–84 (9th Cir.1980) (en banc) (due process does not bar conviction based upon evidence seized when agent offered five-year-old boy five dollars to indicate where boy's mother had hidden cache of heroin). Exploiting an emotionally intimate relationship between lovers seems no more egregious than exploiting an emotionally intimate relationship between family members. Second, courts are not well equipped to assess the degree of intimacy perceived by particular suspects. The proposed focus on intimacy would therefore exacerbate the line-drawing difficulties discussed previously, such that individual judicial determinations that sexual relationships were sufficiently intimate to bar prosecution would lack the "universality" of condemnation required by the due process clause. Accordingly, we decline the invitation to interpret the due process clause as prohibiting the government from using informants who establish emotionally intimate, as distinguished from purely physical, sexual relationships with their suspects.

In applying the outrageous conduct doctrine to the facts of this case, we must focus not only on the acceptability of Miller's sexual activity but also on the degree of government culpability for Simpson's treatment. We conclude that any outrage at Miller's deportment must be tempered by the fact that it is not as readily attributable to the government as the conduct held to violate due process in previous cases. First, Simpson cannot contend that Miller's status as a paid informant makes her every decision about how to establish rapport with the suspect attributable to the FBI. This argument is squarely foreclosed by *United States v. Prairie,* 572 F.2d 1316 (9th Cir.1978), in which we held there was no due process violation when, unbeknownst to the government, a paid informant had sex with her suspect. In *Prairie,* the informant was a known prostitute, but she "was neither paid nor asked by the agents to establish any particular relationship with [the suspect] and, in any event, her official role was limited to that of introducing a willing seller of narcotics to a willing purchaser." 572 F.2d at 1319. We held on these facts that there could be no due process violation because the informant's use of sex in dealing with her suspect was not attributable to the government. *Id. See also Ryan,* 548 F.2d at 791 (private informant's interference with a suspect's attorney-client relationship was not attributable to government where there was no "evidence that [the informant] consulted with state agents before [interfering] or that the state was in any manner involved in this [interference]"). As in *Prairie,* the facts as found by Judge Hatter indicate that the FBI did nothing to encourage the informant to use sex in carrying out her assignment. Indeed, Judge Hatter explicitly found that agent Hamer repeatedly "instructed Miller ... not to get sexually involved." 10 Reporter's Transcript ("R.T.") at 47. Therefore Miller's initial decision to establish a deceptive sexual and emotional relationship cannot be used to characterize the *government's* conduct in this case as outrageous.

To be sure, Judge Hatter found that the FBI's hands were not entirely clean. At some point the FBI became aware of Mil-

ler's sexual involvement with Simpson, and though agent Hamer continued to warn her to refrain from further sexual activity, Judge Hatter found that Hamer probably expected her to continue. 10 R.T. at 47. The FBI deliberately closed its eyes to Miller's ongoing conduct, 10 R.T. at 46, and did not terminate her involvement in the investigation.

Nevertheless, we consider the government's passive tolerance here of a private informant's questionable conduct to be less egregious than the conscious direction of government agents typically present in outrageous conduct challenges. Requiring the FBI to pull out just as an informant's efforts are coming to fruition merely because she engages in sexual activity on her own initiative would seriously undermine the FBI's ability to sustain a carefully planned long-term investigation into secretive criminal enterprises. We hold that on the unique facts before us, taking into account both our reluctance to conclude that Miller's actions were so out of step with universal contemporary sexual norms that they "shocked the conscience" and the FBI's somewhat diminished culpability for Miller's sexual activity, the government's conduct was not so outrageous as to bar prosecution of the defendants.[4]

We recognize that many people in our society may find the deceptive use of sex in law enforcement to be morally offensive. Nonetheless, "in order to apprehend those engaged in serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency," *Bogart*, 783 F.2d at 1438, and therefore the due process

clause does not "give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644. Rather, our Constitution leaves it to the political branches of government to decide whether to regulate law enforcement conduct which may "offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically," *Rochin*, 342 U.S. at 172, 72 S.Ct. at 209, but which is not antithetical to fundamental notions of due process.

## B

### THE "MANIPULATION" OF MILLER INTO BECOMING AN INFORMANT

Judge Hatter also focused upon "the Government's manipulation of Helen Miller into becoming an informant" in ruling that the government's conduct towards Simpson was so outrageous as to violate due process.[5] *Findings*, at 3. Although he remarked that he was "offended" by the sight of Helen Miller, "a tragic figure," and that "the Government has made her even more tragic" by "plac[ing] her in ... a set of factual situations that would bring even more stress to bear [on her]," 10 R.T. at 45–46, Judge Hatter made no detailed findings in support of his "manipulation" conclusion. The defendants and the American Civil Liberties Union suggest that Judge Hatter's "manipulation" conclusion was based on evidence that the FBI promised to ease off its investigation into her own narcotics activities in exchange for her help and that the FBI "made her continually dependent on them through their ini-

---

**4.** We need not decide at this time whether the use of sex as a law enforcement tool would "shock the conscience" under circumstances where the government is clearly responsible, as would be the case if Miller had been a law enforcement officer rather than a paid informant. We note, however, that state courts have permitted law enforcement officers to use sex deceitfully to gather information when the suspected crime was prostitution. *See, e.g., State v. Tookes*, 67 Haw. 608, 699 P.2d 983 (1985) (rejecting an outrageous conduct challenge to deceitful use of sex by a civilian volunteer acting at behest of police investigating a prostitution ring); *Anchorage v. Flanagan*, 649 P.2d 957

(Alaska Ct.App.1982) (same for use of sex by undercover officer); *State v. Putnam*, 31 Wash. App. 156, 639 P.2d 858 (1982) (same for use of sex by civilian authorized by police to turn tricks to gather evidence).

**5.** Judge Hatter made no finding or suggestion that the government manipulated or coerced Miller into having sex with Simpson or that she was paid for doing so. Rather, Judge Hatter focused solely on the means used to recruit Miller as an informant, well before the FBI asked her to participate in its investigation of Simpson.

tial and continued concern and support for her, both monetarily and emotionally." *Brief of Amicus Curiae, The American Civil Liberties Union*, at 26.

Even accepting the defendants' explanation of Judge Hatter's conclusion,[6] we find no justification for ruling that the FBI's treatment of Miller raises due process concerns about the investigation of Simpson.[7] It is beyond cavil that government agents "may rely on paid informants in order to locate and arrest criminals." *United States v. McQuin*, 612 F.2d 1193, 1195–96 (9th Cir.), *cert. denied*, 445 U.S. 955, 100 S.Ct. 1608, 63 L.Ed.2d 791 (1980). Surely Miller was not rendered ineligible to serve as a paid informant because she was poor and because she was vulnerable to becoming emotionally dependent upon her case agents. And, the fact that the agents offered to back off their investigation into Miller's own narcotics activities raises no due process concerns.[8] It is common practice for the government to reduce or drop charges against persons who cooperate with law enforcement officials in the prosecution of others, and we find no constitutionally significant distinction between the use of such a carrot at the prosecution stage and at the investigation stage. *See Ryan*, 548 F.2d at 788–89 (no due process violation when government encouraged one suspect to inform against a friend by threatening suspect with criminal prosecution and warning him that his health would be irreparably damaged by imprisonment). Hence, the government's "manipulation" of Miller into becoming an informant provides no basis for dismissing the indictment on due process grounds.

## C

### THE CONTINUED USE OF AN INFORMANT WHO ENGAGES IN UNRELATED CRIMINAL ACTIVITY

The third aspect of the FBI's conduct cited by Judge Hatter in dismissing the indictment was "the Government's continued employment of Miller despite her known status as a heroin addict and prostitute, and despite her numerous arrests." *Findings*, at 3. Judge Hatter found that the FBI agents knew Miller was a prostitute and a heroin addict at the time they recruited her and that Miller told the agents during the investigation that she

---

**6.** The FBI's conduct with respect to Miller was the subject of conflicting evidence during the pre-trial hearing. Judge Hatter's only explicit finding of fact concerning this issue stated simply that "On December 23, 1982, Helen Miller agreed to become a paid FBI informant." *Findings*, at 1. However, we can infer that Judge Hatter found the facts necessary to support his conclusion that Miller was "manipulated." *See South-Western Publishing v. Simons*, 651 F.2d 653, 656 n. 2 (9th Cir.1981) ("failure to make an express finding of fact by the district court 'does not require remand if a complete understanding of the issues may be had without the aid of separate findings'") (citation omitted), *cert. denied*, 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982).

**7.** We reject the government's suggestion that, because the "limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant*," *Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976) (plurality opinion), the defendants here have no standing to complain about the FBI's treatment of an informant. While a "defendant does not have standing to raise a due process violation suffered by a third party," *Bogart*, 783 F.2d at 1433, we have held that because "the target of the government's activity" is a *direct* victim of the government's conduct, the target "has standing to contest his conviction on the grounds that the government's conduct ... violated *his* due process rights." *Id.* (emphasis added). As the direct target of the FBI's investigation, therefore, Simpson has standing to complain about any outrageous conduct occurring during the investigation. That the informant may also be characterized as a "victim" of the government's conduct in no way undermines Simpson's status as a targeted victim with standing under *Bogart. See Ryan*, 548 F.2d at 788–91 (considering defendant's due process challenge to indictment based on the allegedly coercive manner in which government officials recruited a private informant for his investigation).

Since we reach and reject Simpson's challenge on the merits, we need not decide whether defendants Anderson and Freeman, who may not have been direct targets of Miller's activities as an informant, also have standing.

**8.** As far as the record shows, Miller was perfectly competent to decide whether it was in her own self-interest to serve as an informant in exchange for money and a chance to escape prosecution on drug charges.

continued to engage in these criminal activities.

We find no authority supporting the defendants' claim that the continued use of an informant known to be committing unrelated crimes without the government's urging or approval raises due process concerns. It is unrealistic to expect law enforcement officers to ferret out criminals without the help of unsavory characters. This court has held that "[g]overnment agents may approach people already engaged in or contemplating criminal activity" to employ them as informants. *Bogart*, 783 F.2d at 1438; *see Ryan*, 548 F.2d 782 (government agents used suspect in bribery scheme as informant to catch co-conspirators). Thus the mere fact that Miller continued to use heroin and engage in prostitution during the investigation of Simpson did not oblige the FBI to stop using her as an informant. Indeed, government agents can go so far as to direct an informant to participate in the very criminal enterprise that is under investigation. *See, e.g., United States v. O'Connor*, 737 F.2d 814, 817–18 (9th Cir. 1984) (use of informant to sell cocaine provided by government was not outrageous), *cert. denied*, 469 U.S. 1218, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985); *see also United States v. Bowling*, 666 F.2d 1052, 1054–55 (6th Cir.1981) (informant's participation in nonviolent property crimes held not to be outrageous), *cert. denied*, 455 U.S. 960, 102 S.Ct. 1475, 71 L.Ed.2d 680 (1982); *United States v. Brown*, 635 F.2d 1207, 1213 (6th Cir.1980) (same).[9]

### D

### THE GOVERNMENT'S INVOLVEMENT IN "MANUFACTURING" THE DEFENDANTS' CRIME

Finally, although Judge Hatter did not rely on this argument in dismissing the indictment, Simpson contends on appeal that the FBI's conduct was outrageous because the agents essentially "manufactured" his crime by supplying him with a willing purchaser and by using Miller to persuade him to sell the drugs in the first place. Simpson correctly notes that the outrageous conduct doctrine bars prosecution of defendants when government agents have " 'engineer[ed] and direct[ed] the criminal enterprise from start to finish' " or " 'generat[ed] ... new crimes merely for the sake of pressing criminal charges against the defendant.' " *Bogart*, 783 F.2d at 1436 (quoting *Ramirez*, 710 F.2d at 539, 540). However, we reject Simpson's contention that the FBI's conduct in this case violated due process as measured by this "government-manufactured crime" test.[10] Judge Hatter's findings contain no suggestion that the FBI created the criminal enterprise. To the contrary, he found that the FBI agents already had a "tremendous amount of knowledge with regard to [Simpson's] activities" when they targeted him for inves-

**9.** We recognize that there are constitutional limits on the type and extent of criminal activity, germane to the investigation or not, in which the government can become involved:

It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction.

*Hampton*, 425 U.S. at 493 n. 4, 96 S.Ct. at 1652, n. 4 (Powell, J., concurring) (quoting *United States v. Archer*, 486 F.2d 670, 676–77 (2d Cir. 1973)). Miller's nonviolent criminal activity that was neither encouraged nor condoned by the government falls far short of this limitation.

**10.** We know of only two federal cases where prosecution was barred because the government

"involve[d] itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations" as to make prosecution "repugnant to American criminal justice." *Greene v. United States*, 454 F.2d 783, 787 (9th Cir.1971). In *Greene*, government agents collaborated with a suspected criminal to establish an illegal bootlegging operation and then sustained the operation, acting as both the supplier and sole customer of the illegal operation it had created. In *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), government agents established and supplied a narcotics laboratory in order to arrest a suspect who was at the time "lawfully and peacefully minding his own affairs." *Id.* at 381; *see also Bogart*, 783 F.2d at 1438 (remanding to district court for further findings of fact relevant to the government's alleged role in creating criminal activity).

tigation, so much so that "the Government would be remiss if it did not conduct an intensive investigation of this individual." 10 R.T. at 44. Rather than creating and directing the criminal enterprise from beginning to end, the FBI simply used an informant to infiltrate a preexisting criminal enterprise. The due process clause does not bar prosecution when an informant's "official role was limited to that of introducing a willing seller of narcotics to a willing purchaser." *Prairie*, 572 F.2d at 1319; *see also Bogart*, 783 F.2d at 1437–38 (courts have consistently rejected outrageous conduct challenges when the targeted criminal enterprise was underway before the government agent became involved).

In conclusion, we hold that the FBI's conduct in recruiting and using Helen Miller as an informant is not "shocking to the universal sense of justice." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960)). Accordingly, we reverse the district court's order dismissing the indictment on due process grounds.

## II

### THE WIRETAP ISSUE

■ Judge Hatter also granted the defendants' motion to suppress evidence obtained from wiretapping Simpson's home phone and several public phones.[11] Following an evidentiary hearing, Judge Hatter found that the affidavit submitted by agent ·Robert Ross ("*Ross Affidavit*") to satisfy the statutory requirement that wiretapping be authorized only when necessary[12] was "artfully drafted with the intent to mislead

the reviewing judge." *Findings of Fact and Conclusions of Law Suppressing Wiretap Evidence ("Wiretap Findings")*, at 5. The affidavit stressed the need for wiretapping to identify all of the members of Simpson's suspected narcotics enterprise. In it Ross claimed that adequate evidence could not be obtained through other investigative avenues because Simpson and his co-conspirators had "insulated themselves and their high echelon accomplices from all but a small circle of associates" such that "[u]ndercover agents, confidential informants, and witnesses cannot penetrate the organization to the highest levels because of insulation tactics utilized." *Ross Affidavit*, at 47. With respect to the FBI's plan to set Simpson up for a drug bust, the affidavit claimed that "there is no reason to believe that such a purchase would identify the source and storage place for the heroin, nor the identities of other conspirators." *Id.* at 50.

Given the affidavit's emphasis on Simpson's insulation from potential informants to justify the need for wiretapping, Judge Hatter found particularly misleading the affidavit's failure to disclose the true depth of Miller's involvement in Simpson's activities. The affidavit "portrayed Helen Miller as an innocent, uninvolved eavesdropper to Darrel Simpson's activities," thus obscuring the fact that she "was deeply involved." *Wiretap Findings*, at 4. Moreover, the affidavit "created the illusion that Source Two and Individual A were different people," when in fact both were Helen Miller, and Ross' failure to so inform the reviewing judge "reflects a conscious effort to mislead." *Id.* Finally, the affidavit failed to report that within two months of meeting Simpson Miller had

---

**11.** Simpson has standing to move for suppression of the wiretap evidence as an "aggrieved person" under 18 U.S.C. § 2518(10)(a) both because he was a party to an intercepted conversation and because a conversation was intercepted on his premises. *See United States v. Jabara,* 618 F.2d 1319, 1326 (9th Cir.), *cert. denied,* 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 70 (1980). It is not clear from the record whether Anderson or Freeman were parties to intercepted conversations or enjoyed a privacy interest in the wiretapped premises, but the government does not contest their standing to move for suppression of the wiretap evidence.

**12.** An application for a court-authorized wiretap must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous," 18 U.S.C. § 2518(1)(c), and it must also recite facts indicating that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

twice arranged for him to sell heroin to undercover agents and had also introduced him to Agent Hamer. *Id.* at 5. Because of these material misrepresentations and omissions, Judge Hatter found that the affidavit "was not a complete statement as required by Title 18 United States Code, Section 2518(1)(b)(i)" and that "the omissions create the illusion of necessity for the wiretap." *Wiretap Findings,* at 4–5. He concluded that the affidavit, when corrected for the misleading statements and omissions, failed to establish the necessity of wiretapping as required by law. *See generally United States v. Ippolito,* 774 F.2d 1482, 1487 (9th Cir.1985).[13]

The government argues on appeal that the details of Miller's involvement in the investigation of Simpson were immaterial to the issuing judge's finding of necessity. In other words, the government contends that even when "corrected" for the omissions cited by Judge Hatter, the affidavit still established the "reasonable unlikelihood of a successful *total* penetration of the drug organization under investigation by undercover techniques." *Appellant's Opening Brief,* at 33. After reviewing the affidavit in light of the evidence adduced at the evidentiary hearing and the findings of fact made by Judge Hatter, however, we reject the government's claim of immateriality.[14] The government's assertion that traditional law enforcement methods could not discover the identity of all members of the alleged drug ring assumes that Miller had no potential to win Simpson's confidence enough to learn the details of the drug enterprise. In fact, however, Judge Hatter found that Miller had become "deeply involved" with the enterprise. *Wiretap Findings,* at 4. Miller had obviously established a close friendship with Simpson, had been present on several occasions while Simpson conducted business with other members of the alleged drug ring, *Ross Affidavit,* at 27–33, and had

become trusted enough to be permitted to identify potential drug purchasers for Simpson. In *Ippolito,* we rejected the government's claim that wiretapping was needed to discover the identities of unknown cohorts when in fact an informant "was both willing to testify and had great potential for uncovering the entirety of the conspiracy under investigation." 774 F.2d at 1486–87. Following *Ippolito,* we conclude that if the full details about Miller's penetration into Simpson's activities were known to the issuing judge, "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown." *Ippolito,* 774 F.2d at 1487.

To be sure, we have under certain circumstances found wiretapping necessary when traditional investigatory techniques alone could lead to the apprehension and prosecution of only the main conspirators but not the "satellite" conspirators higher up in the drug distribution scheme. *See, e.g., United States v. Brone,* 792 F.2d 1504, 1506 (9th Cir.1986); *United States v. Sandoval,* 550 F.2d 427, 430 (9th Cir.1976), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977). However, we have required the government in each wiretap application to identify *specific* circumstances indicating that traditional techniques cannot reveal the broader picture. As we noted in *Ippolito,* "we must be careful not to permit the government merely to characterize a case as a 'drug conspiracy' . . . that is therefore inherently difficult to investigate. The affidavit must show with specificity why in *this particular investigation* ordinary means of investigation will fail." 774 F.2d at 1486 (emphasis in original) (quoting *United States v. Robinson,* 698 F.2d 448, 453 (D.C.Cir.1983) (per curiam)). Here, the specific facts withheld from the issuing judge about this particular investigation reveal that traditional techniques could have led to the successful infiltration

---

**13.** Judge Hatter apparently found that suppression was independently required because the affidavit failed to satisfy other statutory requirements of section 2518. Because we affirm his order based on the government's failure to show necessity, we need not review the other grounds upon which Judge Hatter based his suppression order.

**14.** Underlying factual findings of the district court concerning misleading statements and omissions are reviewed under the clearly erroneous standard. *See Ippolito,* 774 F.2d at 1484. The ultimate question whether any misstatements or omissions were material is a mixed question of law and fact and is reviewed *de novo. Id.*

of the entire enterprise. Accordingly, we affirm Judge Hatter's order suppressing the wiretap evidence.

### CONCLUSION

The district court's order suppressing wiretap evidence is affirmed. The order dismissing the indictment on due process grounds is reversed, and the case is remanded for further proceedings consistent with this opinion.