**STATE of Minnesota, Respondent,**

v.

**Adam Kent CHRISTENSON, Appellant.**

**No. A12–0262.**

Court of Appeals of Minnesota.

Nov. 26, 2012.

Review Denied Feb. 19, 2013.

Lori Swanson, Attorney General, St. Paul, MN; and Timothy R. Faver, Beltrami County Attorney, David P. Frank, Assistant County Attorney, Bemidji, MN, for respondent.

Mark D. Nyvold, Fridley, MN, for appellant.

Considered and decided by STONEBURNER, Presiding Judge; HUDSON, Judge; and LARKIN, Judge.

## OPINION

LARKIN, Judge.

This appeal stems from appellant's conviction of third-degree sale of a controlled substance. Appellant claims that the government engaged in outrageous conduct in violation of his rights to due process under the Fourteenth Amendment to the United States Constitution and Article I, Section 7, of the Minnesota Constitution. Specifically, appellant argues that the government engaged in outrageous conduct because its citizen informant used sex to entice appellant to sell the informant narcotics in a controlled buy. Because the

government did not know of the informant's use of sex in the investigation, much less induce that conduct, the complained-of conduct is not so outrageous as to bar prosecution. We therefore affirm.

## FACTS

In early 2010, Bemidji police officer James Marcotte, who was assigned to the Paul Bunyan Drug Task Force, enlisted a civilian to work as an informant (CI). Over a period of several months, the CI performed 20 to 30 controlled buys involving a total of ten suspects. The police compensated the CI for each controlled buy, and they paid her thousands of dollars in compensation. Marcotte was impressed with the CI's ability to cultivate targets for controlled buys, but never instructed the CI regarding the methods she should use to identify proposed targets or to gain their confidence. But Marcotte did tell the CI to avoid arranging buys with close personal friends or family members, due to the potential conflicts of interest.

During the week of August 10, 2010, the CI told Marcotte that she believed that appellant Adam Kent Christenson would sell her Percocet. The CI told Marcotte that she thought Christenson was getting the pills from a hospital where he worked. On August 13, the CI, Marcotte, and another officer met to prepare for a controlled buy from Christenson. Marcotte searched the CI and her vehicle, placed a recorder and transmitter on her, and gave her $1,500 from the task force's buy fund. Marcotte activated the recorder, and the CI drove to Christenson's residence in Bemidji. Marcotte and the other officer followed the CI in a separate vehicle, while additional officers watched Christenson's home.

The CI met Christenson in his garage. Christenson sold the CI 50 Percocet tablets for $1,500. The CI left Christenson's residence and met Marcotte. Marcotte retrieved the Percocet tablets, searched the CI and her vehicle, and debriefed her. The state charged Christenson with second-degree sale of a controlled substance based on this sale.

Christenson moved for dismissal on the basis of the due-process defense as outlined in *State v. Ford,* 276 N.W.2d 178 (Minn.1979). The district court held an evidentiary hearing on the motion and heard testimony from Marcotte and the CI. During the hearing, the CI testified that it was her idea to get the drugs and that she had to "bribe" Christenson with sex to convince him to sell her the pills. She also testified that she told Christenson that if he sold her the drugs, she would "fool around more." Related to this issue, the district court made the following factual finding:

> [The CI] apparently engaged in a sexual relationship with [Christenson]; however, it appears clear from the record that their sexual relationship pre-existed her disclosure of [Christenson's] identity to Marcotte. According to [the CI's] testimony at the hearing, she last had sex with [Christenson] a "few weeks" before the August 13 drug deal. There is absolutely no evidence that Marcotte encouraged her to become involved sexually with [Christenson] or that he was even aware of it.

The district court concluded that Christenson's due-process rights were not violated and denied his motion to dismiss. Christenson subsequently waived his right to a jury trial and agreed to a stipulated-facts trial pursuant to Minn. R.Crim. P. 26.01, subd. 4.[1] The district court found

---

1. A *"Lothenbach* proceeding" is a proceeding in which a defendant submits to a court trial on stipulated facts without waiving the right to appeal pretrial issues. *See State v. Lothen-*

Christenson guilty of an amended charge of third-degree sale of a controlled substance, stayed imposition of sentence, and placed Christenson on probation for up to 20 years. This appeal follows.

## ISSUE

Does a citizen informant's sexual relationship with the target of a police investigation constitute outrageous government conduct in circumstances in which the police did not know of the conduct or induce the conduct?

## ANALYSIS

■ Christenson argues that his conviction should be reversed because the CI's use of sex to entice him to sell her drugs constituted outrageous conduct in violation of the due-process guarantees of the United States and Minnesota Constitutions. *See* U.S. Const. amend. XIV, § 1; Minn. Const. art. I § 7. "[T]he concept of fundamental fairness inherent in the due-process requirement will prevent conviction of even a predisposed defendant if the conduct of the government in participating in or inducing the commission of the crime is sufficiently outrageous." *State v. Morris*, 272 N.W.2d 35, 36 (Minn.1978) (citing *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976)). But the challenged government conduct must "reach a demonstrable level of outrageousness before it could bar conviction." *Id.* (quotation omitted). Christenson's argument presents a question of law that we review de novo. *See State v. Burkland*, 775 N.W.2d 372, 374 (Minn.App.2009) ("Whether a constitutional violation has occurred presents a question of law, which we review de novo."), *review denied* (Minn. Jan. 27, 2010).

*The Specific Analytical Tests*

The appellate courts of this state have utilized two specific tests to determine whether the government's inducement of or participation in criminal conduct is sufficiently outrageous to bar a conviction. One test arose in the context of prostitution investigations and was recently explained by this court as follows: "[W]hether officer conduct in a prostitution investigation is sufficiently outrageous to violate due process is determined by the nature of the officer's conduct and whether the conduct is justified by the need to gather evidence sufficient to arrest the target of the investigation for the offense." *Id.* at 374–76 (discussing *Morris*, 272 N.W.2d at 35 and *State v. Crist*, 281 N.W.2d 657 (Minn.1979) and concluding that "when a police officer's conduct in a prostitution investigation involves the initiation of sexual contact that is not required for the collection of evidence to establish the elements of the offense, this conduct, initiated by the investigating officer, is sufficiently outrageous to violate the concept of fundamental fairness inherent in the guarantee of due process" (quotation omitted)).

■ This court has also used a specific test to analyze outrageous-conduct claims that arise from controlled-substance investigations. *See State v. James*, 484 N.W.2d 799, 802 (Minn.App.1992), *review denied* (Minn. June 30, 1992). The analysis asks

(1) whether the police manufactured a crime which otherwise would not likely have occurred, or merely involved themselves in an ongoing criminal activity [;]

(2) whether the police themselves engaged in criminal or improper conduct repugnant to a sense of justice [;]

bach, 296 N.W.2d 854, 857–58 (Minn.1980) (approving this procedure). "Minn. R.Crim. P. 26.01, subd. 4, effective April 1, 2007,

implements and supersedes the procedure authorized by [*Lothenbach* ]." *State v. Antrim*, 764 N.W.2d 67, 69 (Minn.App.2009).

(3) whether the defendant's reluctance to commit the crime is overcome by appeals to humanitarian instincts such as sympathy or past friendship, by temptation of exorbitant gain, or by persistent solicitation in the face of unwillingness [; and]

(4) whether the record reveals simply a desire to obtain a conviction with no reading that the police motive is to prevent further crime or protect the populace.

*Id.* at 802–03 (citing *People v. Isaacson,* 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78, 83 (1978), and applying the *Isaacson* factors to conclude that a "reverse-sting" operation in which undercover officers posed as narcotics dealers and sold narcotics to individuals who approached them did not violate due process).

In this case, the district court applied the four-factor test from *James* and concluded that Christenson's due-process rights were not violated. Christenson contends that the district court erred by using the *James* analysis and that the *Burkland* test should be used to determine his outrageous-conduct claim. He argues that the CI's use of sex "to get Christenson to sell her drugs makes this case analogous to *Burkland*" and that "the resolution of [Christenson's] due-process claim should have been decided by the analysis applicable to due-process outrageous conduct claims that arise when sex is used to investigate alleged criminal conduct like prostitution." He further argues that "[the *James*] factors are not helpful and appropriate to resolving Christenson's due-process claim because the range of factors is too broad." *See Burkland,* 775 N.W.2d at 375 (declining to apply the *James* factors "because the nature of a controlled-substance investigation differs significantly from that of a prostitution investigation"). The state counters that *James* provides the appropriate analytical framework because it applies to outrageous-conduct claims that stem from controlled-substance investigations.

We disagree with the state that the parties' dispute regarding whether this court should apply the test from *James* or *Burkland* is resolved by asking whether the underlying investigation involved a controlled-substance crime or prostitution. We believe that the relevant focus should be on the challenged conduct itself, namely, the use of sex in an investigation. Because the challenged conduct in *James* involved the use of a "reverse-sting" operation and not the use of sex, *James* is not directly on point. *See James,* 484 N.W.2d at 800–01; *see also Burkland,* 775 N.W.2d at 375 (stating that "the *James* factors are not directly applicable" to a "sex-for-money exchange involving intimate activities on the part of the buyer and seller").

But we also disagree with Christenson that the *Burkland* test is applicable merely because the challenged conduct in that case was sexual. Although *Burkland* involved the use of sexual conduct in an investigation, the conduct at issue was engaged in by a police officer and not by a CI. *Burkland,* 775 N.W.2d at 372. Similarly, the sexual acts underlying the outrageous-conduct claims in the two prostitution cases that *Burkland* relied on, *Morris* and *Crist,* were also committed by police officers. *See Morris,* 272 N.W.2d at 35–36 (rejecting argument that an undercover officer's conduct in exposing himself to a suspect during a prostitution investigation was outrageous); *Crist,* 281 N.W.2d at 658 (rejecting argument that due process was violated when an undercover officer exposed himself to a suspect during a prostitution investigation). Thus, *Burkland,* like *James,* is factually distinguishable from this case.

Christenson contends that this factual distinction is insignificant, arguing that "[i]t makes no difference that [the CI] was not a sworn police officer, since as a paid State agent, her conduct must be attributed to the police." Christenson goes so far as to argue that "it makes no difference whether the police knew that [the CI] was using sex to further her drug investigation of [Christenson]" and that it is "irrelevant whether the police had allowed [the CI] to use sex in her investigation."

Christenson does not cite direct authority to support his contention that the challenged conduct of a paid CI during a police investigation must be attributed to the police when analyzing an outrageous-conduct claim even though the police did not know of the conduct or induce the conduct.[2] Our research indicates that the appellate courts of this state have not considered the precise issue of whether the conduct of a paid CI is "attributable to the police and by extension the [s]tate" even though the conduct was unknown to the police. But one federal circuit has rejected the proposition that a CI's status as a paid government informant makes his or her every decision regarding how to establish rapport with a suspect attributable to the government. In *United States v. Simpson*, the FBI employed a CI to investigate a suspected narcotics dealer. 813 F.2d 1462, 1464 (9th Cir.1987). The CI and the suspect became sexually intimate. *Id.* The Ninth Circuit concluded that the

FBI's continued use of the CI after learning of her sexual involvement with the suspect "was not so shocking as to violate the due process clause." *Id.* at 1465. In so concluding, the federal circuit court explained that

[The defendant] cannot contend that [the CI's] status as a paid informant makes her every decision about how to establish rapport with the [defendant] attributable to the FBI. This argument is squarely foreclosed by *United States v. Prairie*, 572 F.2d 1316 (9th Cir.1978), in which we held there was no due process violation when, unbeknownst to the government, a paid informant had sex with her suspect. In *Prairie*, . . . [w]e held . . . that there could be no due process violation because the informant's use of sex in dealing with her suspect was not attributable to the government. *Id.* As in *Prairie*, the facts as found [in this case] indicate that the FBI did nothing to encourage the informant to use sex in carrying out her assignment. Indeed, [the court] explicitly found that [the] agent . . . repeatedly "instructed [the CI] . . . not to get sexually involved." Therefore [the CI's] initial decision to establish a deceptive sexual and emotional relationship cannot be used to characterize the *government's* conduct in this case as outrageous.

*Id.* at 1467 (citations omitted).

The Ninth Circuit's reasoning is persuasive. Because the police in this case did

2. Christenson's arguments for attributing the CI's conduct to the police are primarily policy-based. He contends that "the [police's] failure to supervise and give guidance to [the CI] makes it appropriate to hold the police accountable for her conduct." He also argues that "[the CI's] conduct must be attributed to the police because it would be intolerable if the police could simply turn their paid investigative [informants] loose and incur no consequences, no matter how outrageous their conduct" and that "if non-police officer undercover agents can run amok and engage in all sorts of deplorable and outrageous behavior, and then distance themselves legally from any accountability for the actions committed, this will breed disrespect for the law and the police." Christenson's policy arguments are unavailing: "Because this court is limited in its function to correcting errors it cannot create public policy." *LaChapelle v. Mitten*, 607 N.W.2d 151, 159 (Minn.App. 2000), *review denied* (Minn. May 16, 2000).

not know of the CI's sexual conduct or induce the conduct, the conduct is not attributable to the police. And because the CI is not a police officer, we readily distinguish the circumstances in this case from those in *Burkland* and conclude that the *Burkland* test is inapplicable.

*The General Outrageous–Conduct Standard*

Our conclusions that *James* and *Burkland* are factually distinguishable and that the specific tests articulated therein therefore are inapplicable does not preclude analysis of Christenson's outrageous-conduct claim. The tests are merely examples of specific criteria that courts have developed to determine whether police conduct in a particular set of circumstances is sufficiently outrageous to violate due process. *See Morris*, 272 N.W.2d at 36 (stating that "the [United States] Supreme Court has not articulated any useful standards for application of the [due-process] defense" and that it "is a legal defense which must be left to the court to apply"). Although the adoption and use of specific criteria for determining outrageous-conduct claims is useful, we agree with the observation of the Third Circuit that such "criteria, while useful, should not be applied rigidly; the ultimate determination to be made on the merits is whether the government's conduct was so shocking, outrageous, and clearly intolerable that Due Process is offended." *United States v. Nolan–Cooper*, 155 F.3d 221, 233 (3rd Cir.1998) (quotation omitted) (adopting, modifying, and applying criteria used to analyze an outrageous-government-conduct claim based on the sexual misconduct of an undercover government agent, as opposed to a CI).

In the absence of an applicable, specific standard for determining the outrageous-conduct claim in this case, we apply the general standard that asks whether the government's conduct was "sufficiently outrageous to bar [Christenson's] conviction." *Morris*, 272 N.W.2d at 36. In doing so, we keep in mind the Minnesota Supreme Court's statement that "it is clear that there will be few cases in which the [outrageous-conduct] defense will succeed." *Id.* We are also mindful that *Rochin v. California* is the source of the due-process defense recognized by the Minnesota Supreme Court in *Morris*[3] and that *Rochin* sets the bar at conduct that "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952). In *Rochin*, the United States Supreme Court stated that it was

> compelled to conclude that the proceedings by which [the] conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that *shocks the conscience.* Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of gov-

---

**3.** *Morris* cites to *Hampton* as authority for the outrageous-conduct due-process defense. *Morris*, 272 N.W.2d at 36. In discussing the due-process defense in *Hampton*, the United States Supreme Court relied on the following language from *United States v. Russell:* " '[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the govern-

ment from invoking judicial processes to obtain a conviction....' " *Hampton*, 425 U.S. at 489, 96 S.Ct. at 1649–50 (quoting *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973)). *Russell*, in turn, reached this conclusion in reliance on the holding of *Rochin v. California. Russell*, 411 U.S. at 431–32, 93 S.Ct. at 1643 (citing *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)).

ernment to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Id.* at 172, 72 S.Ct. at 209–10 (emphasis added). With that context in mind, we consider whether the district court findings in this case reveal government conduct that shocks the conscience. *See Ford,* 276 N.W.2d at 182 (stating that the district court "must resolve any factual disputes necessary to determining whether the police conduct violated due process").

### The Challenged Conduct

■ Because there is no factually analogous Minnesota precedent, we look to federal caselaw to determine whether the challenged conduct in this case is sufficiently outrageous to violate due process. *See Burkland,* 775 N.W.2d at 374 n. 1 ("Because the due process provisions of the United States and Minnesota constitutions are identical, we interpret them as coextensive."). Federal circuit courts have rejected outrageous-conduct claims based on a CI's sexual relationship with the subject of an investigation. In *United States v. Miller,* the Seventh Circuit rejected an outrageous-conduct claim based on the conduct of a CI who had a sexual relationship with the subject of an investigation that predated the investigation, reasoning that the police apparently did not know of the prior relationship and even if the police had known, they did not encourage use of sex during the investigation. 891 F.2d 1265, 1268 (7th Cir.1989). In *United States v. Shoffner,* the Seventh Circuit rejected an outrageous-conduct claim based on the conduct of a CI who had a sexual

relationship with a suspect that resulted in a pregnancy and who obtained a government-financed abortion, because "as soon as the government learned that [the CI] had had a sexual liaison with [the suspect], it expressed strong disapproval and instructed her in no uncertain terms that the conduct was not to be repeated." 826 F.2d 619, 625–26 (7th Cir.1987).

In *Simpson,* the Ninth Circuit concluded that the defendant's right to due process was not violated by the government's failure to terminate the CI's involvement in the government's investigation of the defendant for narcotics trafficking once the government learned of the CI's ongoing sexual relationship with the defendant. 813 F.2d at 1467–68. The court reasoned that "the deceptive creation and/or exploitation of an intimate relationship does not exceed the boundary of permissible law enforcement tactics." *Id.* at 1466. It also had "great difficulty with [the] theory that [the CI's] use of sex in creating the deceptive relationship rendered [the defendant's] treatment outrageous as a matter of law." *Id.* The court reasoned that "the government's passive tolerance ... of a private informant's questionable conduct [is] less egregious than the conscious direction of government agents typically present in outrageous conduct challenges." *Id.* at 1468.[4] The court held that taking into account its "reluctance to conclude that [the CI's] actions were so out of step with universal contemporary sexual norms that they 'shocked the conscience,'" as well as the FBI's diminished culpability for the CI's sexual activity, "the government's conduct was not so outrageous as to bar prosecution."[5] *Id.*

---

**4.** The Ninth Circuit has subsequently relied on *Simpson* for the proposition that "[d]ue process is not violated unless the [challenged] conduct is attributable to and directed by the

government." *United States v. Barrera–Moreno,* 951 F.2d 1089, 1092 (9th Cir.1991).

**5.** The court noted that it need not decide whether the use of sex as a law-enforcement

We find the reasoning of the federal circuit courts persuasive and similarly conclude that the challenged conduct in this case is not sufficiently outrageous to bar Christenson's conviction. The district court found that the CI "apparently" engaged in a sexual relationship with Christenson. However, any sex that occurred happened a few weeks before the CI informed Marcotte that Christenson was a potential target for a controlled buy. Marcotte did not encourage the CI to engage in sexual activity with Christenson, nor was Marcotte aware that sexual activity had occurred between the CI and Christenson. In fact, Marcotte explicitly told the CI to avoid arranging buys with close personal friends or family members— which reasonably would have included sexual partners. In summary, the police in this case have minimal culpability for the CI's use of sexual conduct during the investigation. This case simply does not present government conduct that "shocks the conscience." *Rochin*, 342 U.S. at 172, 72 S.Ct. at 209.

## DECISION

The CI's use of sexual conduct to arrange a controlled buy from Christenson, which was not known or induced by the police, is not sufficiently outrageous to bar Christenson's conviction on due-process grounds.

**Affirmed.**

tool would violate due process under circumstances in which the government is clearly responsible for the conduct, "as would be the case if [the person who engaged in the conduct] had been a law enforcement officer rather than a paid informant." *Id.* at 1468 n. 4.