**STATE of Minnesota, Respondent,**

v.

**Paul Andrew PETERSEN, Appellant.**

No. A10–416.

Court of Appeals of Minnesota.

July 5, 2011.

Lori Swanson, Attorney General, St. Paul, MN; and Michael O. Freeman, Hennepin County Attorney, Lee W. Barry, Assistant County Attorney, Minneapolis, MN, for respondent.

Bradford Colbert, J. Virgil Bradley (certified student attorney), Legal Assistance to Minnesota Prisoners, St. Paul, MN, for appellant.

Considered and decided by PETERSON, Presiding Judge; MINGE, Judge; and MUEHLBERG, Judge.

## OPINION

MUEHLBERG, Judge.*

Appellant challenges his conviction of intentional second-degree murder, arguing that the district court erred in denying his postconviction petition to withdraw his guilty plea. Appellant contends that his guilty plea was not accurate because he intended to kill an unborn child so he cannot be held legally responsible for killing the victim who died after she was born alive. Appellant also argues that an upward sentencing departure was not justified because it was based solely on the parties' plea agreement. Because appellant's intentional actions caused the death of the victim and substantial and compelling circumstances exist in the record to support an upward sentencing departure, we affirm.

## FACTS

On April 21, 2007, Dameon Gatson drove appellant Paul Andrew Petersen to S.L.'s apartment. Gatson was the father of an unborn child carried by S.L. and he did not want to pay child support, so he had offered appellant $200 to $300 to punch S.L. repeatedly in the stomach. Appellant and Gatson believed that this action would kill the unborn child and cause S.L. to miscarry.

Appellant knocked on the door of S.L.'s apartment and asked S.L. to come out into the hallway. S.L. stated that she did not know appellant so she did not want to talk to him, but appellant told her that he knew

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by

appointment pursuant to Minn. Const. art. VI, § 10.

her and that she should come out of the apartment. When S.L. finally came out of the apartment, appellant punched her in the stomach and then ran. Appellant indicated that the punch was directed at the "child" S.L. was carrying, and that he intended to do what Gatson had asked him to do: kill the "child." [1] S.L. went into labor an hour later and the baby, D.G., was delivered by C-section. D.G. died on May 1, 2007.

On July 5, 2007, a grand jury indicted appellant for first-degree murder and second-degree murder in the death of D.G., and first-degree assault against S.L. On December 18, 2008, appellant pleaded guilty to intentional second-degree murder and first-degree assault. As part of the plea agreement, appellant agreed to an upward durational sentencing departure based on the aggravating factors of the particular vulnerability of D.G. and the particular cruelty with which he treated D.G.

On December 1, 2009, the district court sentenced appellant according to the plea agreement, stating that "[t]he basis of the [upward] departure is the plea agreement between the parties that the victim was treated with particular cruelty and that the victim was particularly vulnerable."

On March 1, 2010, appellant filed a notice of appeal. Subsequently, appellant filed a motion to stay his appeal in order to file a postconviction petition. On November 8, 2010, the district court denied the postconviction petition. This appeal followed.

## ISSUES

I. Did the district court err in determining that appellant's guilty plea created a sufficient factual basis to show that appellant had the requisite intent for second-degree intentional murder?

II. Did the district court abuse its discretion in imposing an upward sentencing departure?

## ANALYSIS

### I.

■ Generally, the district court's decision to deny a postconviction petition is reviewed for an abuse of discretion. *Francis v. State,* 781 N.W.2d 892, 896 (Minn.2010). But where appellant first files a direct appeal, which this court stays to allow appellant to file a subsequent petition for postconviction relief, this court uses the standard of review for direct appeals. *See Santiago v. State,* 644 N.W.2d 425, 439 (Minn.2002) (applying standard of review for direct appeals when defendant requested a stay and direct appeal was dismissed).

■ To be valid, a plea "must be accurate, voluntary, and intelligent." *State v. Theis,* 742 N.W.2d 643, 646 (Minn.2007) (quotation omitted). For a plea to be "accurate," there must be a factual basis established on the record that is sufficient to show that the defendant's conduct fits within the charge for which he is pleading guilty. *State v. Ecker,* 524 N.W.2d 712, 716 (Minn.1994); *Kelsey v. State,* 298 Minn. 531, 532, 214 N.W.2d 236, 237 (1974). The purpose of this requirement is to protect defendants from pleading guilty to charges that are not supported by the facts. *Ecker,* 524 N.W.2d at 716. Appellant maintains that his guilty plea was not accurate because he did not have the requisite intent for second-degree murder.

1. Appellant answered affirmatively to his guilty plea questioning about his intention to kill the "child."

Statutory interpretation is an issue of law, which we review de novo. *State v. Hester*, 796 N.W.2d 328, 331 (Minn.2011). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2006). "In ascertaining the intention of the legislature," we presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable." Minn.Stat. § 645.17 (2006). "When the words of a law are not explicit, the intention of the legislature may be ascertained by considering ... other laws upon the same or similar subjects." Minn.Stat. § 645.16(5). In addition, homicide statutes "should be construed as constituting one systematic body of law. Each statute should be construed in the light of, with reference to, and in connection with the others." *State v. Bolsinger*, 221 Minn. 154, 162, 21 N.W.2d 480, 486 (1946).

A person is guilty of intentional second-degree murder if he or she "causes the death of a human being with intent to effect the death of that person or another, but without premeditation." Minn.Stat. § 609.19, subd. 1(1) (2006).

In *State v. Soto*, the supreme court determined that, in the context of vehicular homicide statutes, the in utero death of a viable fetus did not constitute the death of a "human being." 378 N.W.2d 625, 628–30 (Minn.1985). The court determined that the appropriate definition of "human being" under the vehicular homicide criminal statute should follow the common law definition of a human being, that "a child had to be born alive and have an existence independent of and separate from its mother." *Id.* (citing *W. Lafave and A. Scott*, Criminal Law 530–32 (1972); 40 C.J.S. *Homicide* § 2b (1944); and 2 *C. Torcia*, Wharton's Criminal Law 95–96 (1979)). The court declined to expand the

definition of "person" or "human being" to include an eight-and-one-half-month-old fetus yet unborn because it would result in "drastically rewriting the homicide statutes under the guise of 'construing' them." *Id.* at 630 (citation omitted).

In response to the decision in *Soto*, in 1986 the Minnesota legislature enacted a series of homicide statutes that criminalized the unlawful killing of an unborn child. *See* 1986 Minn. Laws, ch. 388 §§ 1–17 at 346–50; *State v. Merrill*, 450 N.W.2d 318, 323–24 (Minn.1990). Minn.Stat. § 609.2662 (2006) states that a person "is guilty of murder of an unborn child in the second degree" if the person "causes the death of an unborn child with intent to effect the death of that unborn child or another, but without premeditation." An "unborn child" is defined as "the unborn offspring of a human being conceived, but not yet born." Minn.Stat. § 609.266(a) (2006).

Appellant argues that he cannot be held legally responsible for killing D.G. after she was born alive because he "did not intend to kill a human being; rather, he intended to kill an unborn child," which is a different crime. But the punishment for violation of Minn.Stat. § 609.19 and Minn.Stat. § 609.2662 is identical: whoever commits either crime "may be sentenced to imprisonment for not more than 40 years." Thus, the legislature did not intend for one crime to be considered more serious than the other. *See* Minn.Stat. § 645.16 (stating that when construing statutes, this court attempts to "ascertain and effectuate the intention of the legislature"). Therefore, we conclude that the legislature's intent was to criminalize conduct that results in the death of an unborn child in order to prevent another outcome like that in *Soto*. Thus, the statute focuses on criminalizing conduct that results in the

death of a victim, and not the "state of being" of the victim, as appellant argues.

Furthermore, if we were to follow appellant's suggestion that he would have been more fittingly charged under the murder of an unborn child statute, the most he could have been charged with or convicted of under these facts is attempted murder of an unborn child. Yet this was no attempt; appellant's intentional actions resulted in the death of a human being. We presume that the legislature did not intend for an act such as appellant's to be considered a mere attempt, for which the maximum possible punishment is only one-half the maximum sentence for second-degree murder. *See* Minn.Stat. §§ 645.17 (stating that we may presume that the legislature does not intend an absurd result); 609.17, subd. 4(2) (stating that the possible sentence imposed for attempted second-degree murder cannot be more than one-half of the maximum sentence provided for the actual crime).

There is also a policy question present here as to how far society is willing to extend criminal liability when an intended result comes about in an unintended manner. *See* 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4(f) at 480 (2d ed.2003) (discussing a criminal defendant's liability when the intended and actual manner vary). To put the matter less abstractly, appellant's intent was to cause injuries to D.G. that would result in her death in utero, but the injuries instead resulted in D.G.'s death only after she was born alive. This variation is too slight for the law to shrink from imposing criminal liability for the intentional killing of a human being. *See id.* (noting the law's reluctance to hold persons criminally liable for results that occur in an abnormal or unforeseeable manner). The delivery of the injured, but viable, fetus is not so unforeseeable an event that it should spare the one inflicting the injury from criminal liability for the death of a child after he or she is born alive.

At the plea hearing, appellant was asked by defense counsel, "Did [Gatson] ask you to ... punch [S.L.] and kill the child that she was carrying?" Appellant responded, "Yes, ma'am.... [Gatson] told me that ... he didn't want to pay child support to [S.L.], so he told me to punch her in the stomach to cause her to miscarry." While appellant stated that Gatson wanted him to punch S.L. in the stomach to "cause her to miscarry," he also admitted that when he punched S.L. in the stomach, his "intent ... was to kill [the] child." Appellant never specifies on the record that he intended to kill the unborn fetus rather than the resulting human being. The district court could also reasonably infer that appellant intended the "natural and probable consequences" of his actions. *See State v. Cooper*, 561 N.W.2d 175, 179 (Minn.1997). The natural and probable consequences of punching S.L. in the stomach include delivery of a child born alive before dying from the fatal injuries sustained while in utero. We conclude that there was a sufficient factual basis established in the record to show that appellant had the requisite intent for second-degree intentional murder, and the district court did not err in denying appellant's petition for postconviction relief.

We further note that cases in other jurisdictions are instructive. Although none of these cases involve injuries inflicted specifically to cause the death of a fetus, the language is useful in analyzing whether a newborn baby that dies as a result of injuries inflicted while in utero is a "person" under homicide statutes. These cases follow a similar line of reasoning that the element of intent should be read as directed toward the *criminal conduct*, rather than the *state of the victim*: The

Arizona appellate court determined in *State v. Cotton*, 197 Ariz. 584, 5 P.3d 918, 923 (Ariz.Ct.App.2000), that because an infant was "undeniably a 'person' at the time of her death a day after [a] shooting, it is irrelevant that the injuries that led to her death were inflicted while she was still in utero." The Arizona court noted that "[w]hile the homicide statutes require that the victim be a 'person,' they do not limit the nature or timing of the injury that causes the death of the 'person.'" *Id.* at 922. The appellate court in Georgia stated that "it is not the victim's status at the time the injuries are inflicted that determines the nature of the crime . . . , but the victim's status at the time of death which is the determinative factor." *State v. Hammett*, 192 Ga.App. 224, 384 S.E.2d 220, 221 (1989). Recently, in *State v. Courchesne*, 296 Conn. 622, 998 A.2d 1, 14, 68 (2010), the Connecticut Supreme Court stated that "under the born alive rule, a person who inflicts injuries on a fetus in utero with the intent to kill that fetus is guilty of murder if the fetus is born alive but subsequently dies as a result of the injuries suffered in utero." *Id.* at 68.

## II.

■■■■ Appellant argues that the upward sentencing departure is invalid because it was based solely upon a plea agreement between the parties. "We review a sentencing court's departure from the sentencing guidelines for an abuse of discretion." *State v. Geller*, 665 N.W.2d 514, 516 (Minn.2003). "[N]egotiated plea agreements that include a sentencing departure are justified under the sentencing guidelines in cases where substantial and compelling circumstances exist." *State v. Misquadace*, 644 N.W.2d 65, 71 (Minn. 2002). "A plea agreement standing alone, however, does not create such circumstances in its own right. Rather, when reviewing a plea agreement that includes a

sentencing departure, the court must determine whether the offense of conviction reflects any aggravating or mitigating circumstances that warrant a departure." *Id.* A reviewing court examines the record to determine if the reasons given by the district court justify the departure. *Williams v. State*, 361 N.W.2d 840, 844 (Minn.1985). If the reasons given justify departure or if the reasons are inadequate but there is sufficient evidence in the record supporting departure, then the departure is to be upheld. *Id.*

■■■■ Appellant was sentenced to a total of 480 months, which included an upward durational departure of 88 months on the second-degree intentional murder conviction. At the plea hearing, appellant agreed on the record that the circumstances of this case support the upward departure. The sentencing court further stated on the record that "[t]he basis of the departure is the plea agreement between the parties that the victim was treated with particular cruelty and that the victim was particularly vulnerable." The court sentenced appellant accordingly. We conclude, contrary to appellant's argument, that the upward departure was based not just on the plea agreement, but also on aggravating factors that the district court determined were present because appellant agreed they existed.

Furthermore, at least one of the aggravating circumstances stated by the district court is supported by the record. Appellant's victim was a six-month-old fetus that had no way to defend herself. Citing to *State, County of Hennepin v. McClay*, 310 N.W.2d 683, 685 (Minn.1981), which states that everyone is particularly vulnerable when faced with a gun, appellant argues that "every fetus is particularly vulnerable." We disagree with this analogy. While everyone may be particularly vul-

nerable when faced with a gun, an 18–year–old person might be able to turn and run from a potential assault. A six-month-old fetus cannot. We conclude that the record contains sufficient evidence to support a durational departure based on the particular vulnerability of the victim. Because we conclude that the record supports the aggravating factor that the victim was particularly vulnerable, we need not address whether the record supports the other proffered aggravating circumstance that appellant treated the victim with particular cruelty. *See State v. O'Brien,* 369 N.W.2d 525, 527 (Minn.1985) (stating that the presence of a single aggravating factor is sufficient to uphold an upward departure).

Finally, appellant argues that his waiver of a *Blakely* hearing was ineffective. "[A] defendant must expressly, knowingly, voluntarily, and intelligently waive his right to a jury determination of facts supporting an upward sentencing departure before his statements at his guilty-plea hearing may be used to enhance his sentence." *State v. Dettman,* 719 N.W.2d 644, 650–51 (Minn.2006) (discussing *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)). But appellant did not address the effectiveness of his *Blakely* waiver in his principal brief. Issues not raised or argued in appellant's brief cannot be revived in a reply brief. Minn. R. Civ.App. P. 128.02, subd. 4. Appellant has waived this issue and we decline to address it. *See State v. Yang,* 774 N.W.2d 539, 558 (Minn.2009) (finding that because appellant had raised an issue for the first time in his reply brief and the state did not address the issue in its brief, the issue "was not proper subject matter for appellant's reply brief" and was thus waived and stricken).

## DECISION

Because appellant intended to effect the death of the child even though his actions were directed toward the victim while she was still a fetus, we hold that appellant can be held legally responsible for the child's death after she was born alive. The district court did not err in denying appellant's petition for postconviction relief. And because appellant's guilty plea contained sufficient evidence to show the presence of an aggravating factor, we conclude that the district court did not abuse its discretion in imposing an upward sentencing departure according to the parties' negotiated plea agreement.

**Affirmed.**