*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A12-2217**

State of Minnesota,
Respondent,

vs.

Marquin Lamont Craig,
Appellant.

**Filed July 21, 2014
Affirmed
Larkin, Judge**

Ramsey County District Court
File No. 62-CR-12-2368

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Kaarin Long, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Bridget K. Sabo, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Willis, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**LARKIN**, Judge

Appellant was convicted of first-degree possession of a controlled substance and possession of a firearm by an ineligible person based on evidence found during a search of his apartment. He argues that the evidence should have been suppressed because the search-warrant application was based, in part, on an unconstitutional dog sniff that was conducted outside of his apartment door and that without the dog-sniff evidence, the warrant was not supported by probable cause. Because we conclude that the dog sniff did not violate appellant's rights under the United States or Minnesota Constitutions, we affirm.

## FACTS

In March 2012, police officers searched appellant Marquin Lamont Craig's apartment pursuant to a warrant and found a .357 Magnum revolver, a .45-caliber handgun, and more than 25 grams of cocaine. Respondent State of Minnesota charged Craig with first-degree possession of a controlled substance and possession of a firearm by an ineligible person.

Craig moved the district court to suppress the evidence obtained during the search. Craig argued that the warrant was based, in part, on information gathered during an unconstitutional dog sniff outside of his apartment door. Craig further argued that without the unlawfully obtained dog-sniff evidence, the search warrant was not supported by probable cause. After holding a hearing, at which the state presented testimony from the search-warrant affiant, Deputy Erik Fleck, the district court denied Craig's motion to

2

suppress. Craig preserved the right to appeal his challenge to the search of his apartment by entering a "*Lothenbach* plea."[1] The district court found Craig guilty of both offenses, and sentenced him to serve 135 months in prison for the drug offense and a concurrent 60-month term for the firearm offense.

Craig appealed his conviction to this court. Craig also petitioned the district court for postconviction relief, arguing that "[t]he warrantless dog sniff conducted outside [his] apartment unit was unlawful under [*Florida v. Jardines*, 133 S. Ct. 1409 (2013)], which the United States Supreme Court issued after entry of [his] convictions while his case was pending on appeal." This court stayed Craig's appeal pending completion of postconviction proceedings. The district court denied Craig's petition for postconviction relief, and this court reinstated his appeal.

## DECISION

"When a defendant initially files a direct appeal and then moves for a stay to pursue postconviction relief, we review the postconviction court's decisions using the same standard that we apply on direct appeal." *State v. Beecroft*, 813 N.W.2d 814, 836 (Minn. 2012); *State v. Petersen*, 799 N.W.2d 653, 656 (Minn. App. 2011), *review denied* (Minn. Sept. 28, 2011) (same). "When reviewing a district court's pretrial order on a motion to suppress evidence, 'we review the district court's factual findings under a

---

[1] A "*Lothenbach* proceeding" is a proceeding in which a defendant submits to a court trial on stipulated facts without waiving the right to appeal pretrial issues. *See State v. Lothenbach*, 296 N.W.2d 854, 857-58 (Minn. 1980) (approving this procedure). "Minn. R. Crim. P. 26.01, subd. 4, effective April 1, 2007, implements and supersedes the procedure authorized by [*Lothenbach*]." *State v. Antrim*, 764 N.W.2d 67, 69 (Minn. App. 2009).

clearly erroneous standard and the district court's legal determinations de novo.'" *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quoting *State v. Jordan*, 742 N.W.2d 149, 152 (Minn. 2007)).

Craig requests reversal based on three arguments. First, he argues that the warrantless dog sniff violated his Fourth Amendment right to be free from unreasonable searches under *Jardines*, because the area immediately surrounding his apartment door is the curtilage of his home and the police must have a warrant to conduct a dog sniff in curtilage. Second, Craig argues that even if the entryway to his apartment is not curtilage, the Minnesota Constitution requires law-enforcement officers to have a reasonable, articulable suspicion of illegal activity before conducting a dog sniff and that the dog sniff here was unlawful because the officer did not have an objective basis to believe Craig had drugs in his residence. Third, without the evidence obtained through the unconstitutional dog sniff, the search warrant was not supported by probable cause. We address each argument in turn.

**I.**

The Fourth Amendment to the United States Constitution provides, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. This guarantee establishes the right to privacy "as one of the unique values of our civilization," and "with few exceptions, stays the hands of the police unless they have a search warrant." *McDonald v. United States*, 335 U.S. 451, 453, 69 S. Ct. 191 (1948).

4

Although the Fourth Amendment protects various places and things, "when it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 133 S. Ct. at 1414. And the area "immediately surrounding and associated with the home," which is referred to as curtilage, is regarded as "part of the home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 1742 (1984).

> At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine *whether an individual reasonably may expect that an area immediately adjacent to the home will remain private*.

*Id*. (emphasis added) (quotation and citation omitted).

Craig argues that the "front door to [his] apartment and the immediate surrounding area are his home's curtilage" and that "a dog sniff conducted in the curtilage of a person's home is a Fourth Amendment search . . . requir[ing] a warrant." Craig further argues that because the police lacked a warrant, the dog sniff outside of his apartment door was unconstitutional. Craig relies on *Jardines*, in which the United States Supreme Court recently considered "whether using a drug-sniffing dog on a homeowner's porch to investigate the contents of the home is a 'search' within the meaning of the Fourth Amendment." 133 S. Ct. at 1413. In holding that the dog sniff was a search governed by the Fourth Amendment, the Supreme Court reasoned, in part, that the front porch was curtilage and therefore a constitutionally protected area. *Id.* at 1415.

5

Craig contends that "[i]f the front door and surrounding area of a single family home is curtilage into which an officer must not bring a drug detection dog without a warrant, the same must be true for the front door and surrounding area of an apartment." Craig reasons that "[t]he activity of home life extends to the front door and its immediate area because it is here that residents come and go, welcome and say farewell to guests, receive packages, hang seasonal decorations, [and] leave shoes and other personal items." Under Craig's theory, the curtilage of an apartment extends to the boundaries of any door mat the resident places outside of the apartment door.

Craig also contends that "[u]nder *Jardines*, even if [he] had no reasonable expectation of privacy in his front door or threshold, the area was still the curtilage of his home" and that "the public nature of an apartment's common hallway should be irrelevant based on *Jardines'* property-based reasoning." Craig argues that "[t]he distinction the *Jardines* court made between Fourth Amendment protection borne of basic property rights and Fourth Amendment protection grounded in a reasonable expectation of privacy is critical to understanding and correctly applying the law." As explained next, Craig's reliance on the distinction between the two approaches is unavailing.

Under the traditional property-based analysis, "the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates." *United States v. Jones*, 132 S. Ct. 945, 950 (2012). "[T]he principle" behind the traditional property-based analysis is simply "that, when the Government . . . engage[s] in physical intrusion of a

6

constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment." *Id*. at 951 (quotation omitted).

In *Katz v. United States*, 389 U.S. 347, 351, 88 S. Ct. 507 (1967), the Supreme Court expanded Fourth Amendment protection. Since *Katz*, the Supreme Court has often applied the principle "that a violation occurs when government officers violate a person's reasonable expectation of privacy." *Jones*, 132 S. Ct. at 950 (quotation omitted). But "the *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." *Id*. at 952. Under the *Katz* test, the Supreme Court has applied Fourth Amendment analysis to areas beyond those specifically enumerated in the Fourth Amendment. *See Smith v. Maryland*, 442 U.S. 735, 741, 99 S. Ct. 2577, 2581 (1979) (considering whether the government's "installing and using a pen register [to record telephone numbers dialed] . . . on telephone company property at the telephone company's central offices . . . infringed a 'legitimate expectation of privacy'" "notwithstanding the absence of a trespass"); *Katz*, 389 U.S. at 348-49, 88 S. Ct. at 509 (considering whether the FBI violated the Fourth Amendment when they "attached an electronic listening and recording device to the outside of the public telephone booth"). But the "*Katz* reasonable-expectations test . . . is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas." *Jardines*, 133 S. Ct. at 1417.

In using a traditional property-based analysis in *Jardines*, the Supreme Court first determined that "[t]he officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which . . .

7

enjoys protection as part of the home itself." *Id.* at 1414. The Supreme Court recognized that privacy expectations underlie a curtilage determination in *Jardines*, stating that curtilage is the area immediately surrounding and associated with the home, where "privacy expectations are most heightened." *Id*. at 1415 (quoting *California v. Ciraolo*, 476 U.S. 207, 213, 106 S. Ct. 1809 (1986)). The Supreme Court explained:

> While the boundaries of the curtilage are generally clearly marked, the conception defining the curtilage is at any rate familiar enough that it is easily understood from our daily experience. Here there is no doubt that the officers entered it: The front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends.

*Id.* (quotations omitted).

Because the Supreme Court determined that the porch was curtilage and curtilage enjoys the same Fourth Amendment protections as a home, there was no need to use the *Katz* reasonable-expectation-of-privacy test. *Id*. at 1417. Thus, the Supreme Court stated that it "need not decide whether the officer's investigation of Jardines' home violated his expectation of privacy," rejecting the state's argument that Jardines did not have a reasonable expectation of privacy under the *Katz* standard. *Id*. But contrary to Craig's contention, that does not mean that privacy expectations were irrelevant. The Supreme Court's conclusion that the front porch was curtilage *necessarily* included a determination that there was a heightened expectation of privacy on the porch. *See Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742.

We therefore reject Craig's contention that, under *Jardines*, the area outside his apartment door is the curtilage of his home, even if he has no expectation of privacy in

8

that area. *Jardines* establishes that a homeowner's front porch is curtilage as a matter of law. And when determining whether an area other than a homeowner's front porch is curtilage, privacy expectations remain a relevant consideration.

We now turn to the facts of this case. Here, the police did not enter a homeowner's front porch. The record indicates that officers entered a multi-unit apartment building through an unlocked door, and they walked through a hallway past "multiple apartment doors" to reach Craig's door. Because *Jardines* is factually distinguishable, it does not compel a conclusion, as a matter of law, that the area outside of Craig's apartment door is constitutionally protected curtilage.

Nor does *Jardines* suggest, by analogy, that the area outside Craig's apartment door is curtilage. Our caselaw holds that residents of a multi-occupancy building do not have a reasonable expectation of privacy in common areas of the building. In *State v. Milton*, the Minnesota Supreme Court stated that "a resident of a multifamily residence has a diminished expectation of privacy in the common areas surrounding the residence" because common areas are "'not subject to the exclusive control of one tenant and [are] utilized by tenants generally and the numerous visitors attracted to a multiple-occupancy building." 821 N.W.2d 789, 799 (Minn. 2012) (quotations omitted). Because there is a diminished expectation of privacy in common areas of multi-occupancy buildings, such areas are not curtilage. *Id.* at 799-800 (concluding that a shared stairway and platform at a duplex was a common area and therefore are not curtilage).

This court has similarly held that "[a] dog sniff in a common hallway of an apartment complex is not a search under the Fourth Amendment . . . because a reasonable

9

expectation of privacy in the hallway does not exist." *State v. Davis*, 711 N.W.2d 841, 843 (Minn. App 2006), *aff'd*, 732 N.W.2d 173, 176 n.5, 179 n.10 (Minn. 2007) (affirming on other grounds without considering whether the dog sniff was a search for purposes of the Fourth Amendment and noting that Davis made no argument that the police intruded upon the curtilage of his home).

Other jurisdictions have also held that residents of multi-occupancy buildings do not have a reasonable expectation of privacy in common areas of the buildings. *See United States v. Nohara*, 3 F.3d 1239, 1242 (9th Cir. 1993) (stating that "[m]ost [federal circuit courts] agree a tenant does not have a reasonable expectation of privacy in an apartment building hallway or other common area"); *United States v. McGrane*, 746 F.2d 632, 634 (8th Cir. 1984) (holding that a person had no expectation of privacy in a "common area . . . accessible to all tenants and the landlord" of an apartment building); *United States v. Eisler*, 567 F.2d 814, 816 (8th Cir. 1977) (concluding that a person did not have a "reasonable expectation of privacy in the hallway of [an] apartment building" where "[t]he common hallways of [the] apartment building were available for the use of residents and their guests, the landlord and his agents, and others having legitimate reasons to be on the premises").

Craig nonetheless argues that this court should adopt the reasoning of the Texas Court of Appeals in *McClintock v. State*, which concluded that a stairway landing in front of an apartment door "is part of the apartment's curtilage." 405 S.W.3d 277, 284 (Tex. App. 2013), *review granted* (Tex. Nov. 20, 2013). But the Texas Court of Appeals acknowledged that "curtilage does not include public spaces such as the common areas or

10

hallways of an apartment complex" and reasoned that "[t]he stairway was not a 'common' area; it led only and directly to McClintock's door." *Id*. at 283-84. *McClintock* therefore is not apposite.

Having taken the position that privacy expectations are irrelevant under *Jardines*, Craig does not argue that he had a reasonable expectation of privacy in the area outside of his apartment door, and he does not dispute that his door opened to a common hallway. Based on the precedent and persuasive authorities cited above, and because a curtilage determination requires consideration of reasonable privacy expectations, we conclude that Craig could not have reasonably expected the common area outside of his apartment door to remain private and that the area therefore is not curtilage protected by the Fourth Amendment. *See Oliver*, 466 U.S. at 180, 104 S. Ct. at 1742.

In sum, because the police did not intrude upon constitutionally protected curtilage when they conducted the warrantless dog sniff in this case, Craig's rights under the Fourth Amendment were not violated.

**II.**

The Minnesota Constitution prohibits "unreasonable searches and seizures." Minn. Const. art. I, § 10. A narcotics-detection dog sniff in a common hallway of an apartment building is a search under the Minnesota constitution. *See State v. Davis*, 732 N.W.2d 173, 181-82 (Minn. 2007) (concluding that the police needed reasonable, articulable suspicion to walk a narcotics-detection dog down the common hallway of an apartment building). To justify a warrantless dog sniff, a reasonable, articulable suspicion that a suspect is engaged in illegal drug activity is required. *Id.* at 182. The

11

reasonable-suspicion standard is "less demanding than probable cause," but requires more than an unarticulated "hunch." *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008). "Reasonable suspicion must be based on specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Davis*, 732 N.W.2d at 182 (quotation omitted). But "[t]he requisite showing is not high." *Id.* (quotation omitted). Considering the totality of the circumstances, we review whether a reasonable suspicion exists de novo. *Id.*; *State v. Britton*, 604 N.W.2d 84, 87 (Minn. 2000). Even if one factor alone is not "independently suspicious," several "innocent factors in their totality" may amount to reasonable suspicion of criminal activity. *State v. Martinson*, 581 N.W.2d 846, 852 (Minn. 1998) (quotation omitted).

Craig argues that "use of a drug detection dog violated [his] [state] constitutional rights because [the police] lacked reasonable articulable suspicion that [he] possessed, used or sold drugs in his residence." In this case, Deputy Fleck met with a confidential informant (CI). The CI told Deputy Fleck that a person named Marquin and known as "Loony" was using marijuana, selling large amounts of crack cocaine and marijuana in the Twin Cities, and had handguns in his possession. The CI provided Loony's address, explained the layout of Loony's apartment building, and stated that Loony's apartment was the first door on the right from the front door. The CI reported that Loony's vehicle, a blue Chevrolet minivan, was usually parked outside the apartment. The CI told Deputy Fleck that he had recently seen three handguns in Loony's apartment, described as a 9mm with a laser sight, a .357 Magnum, and a .38 caliber. The CI provided a physical

12

description of Loony and his phone number, and the CI told Deputy Fleck that Loony is a convicted felon and gang member.

Deputy Fleck verified that the phone number provided by the CI was listed under the name Marquin Craig; that the physical description provided by the CI matched the description of Craig on the Department of Motor Vehicles and Driver Services' website; and that Craig had a criminal history including a gun-related conviction and six drug-related convictions. Deputy Fleck learned through police records that Craig's girlfriend's last name was Brown. He conducted surveillance of the address the CI provided, observed a blue Chevrolet Astro van parked near the building, and noticed the name "Craig Brown" on the mailbox for the apartment in question.

Deputy Fleck had more than an unarticulated hunch that Craig was involved in illegal drug activity. The CI told Deputy Fleck that he had been to Craig's apartment, and that he knew Craig smoked marijuana and sold crack cocaine. The CI stated that he had recently seen handguns in Craig's apartment and described the guns in detail. It was rational for Deputy Fleck to infer from these facts that the drug use that the CI reported had been observed at Craig's apartment and that, therefore, illegal drugs may be found there. *See State v. Baumann*, 759 N.W.2d 237, 239, 241 (Minn. App. 2009), *review denied* (Minn. Mar. 31, 2009) (acknowledging "the low threshold the courts have set for reasonable suspicion" and concluding that a dog sniff in a common hallway of an apartment building was justified by a report that a "high number of people" were "coming in and out" of an apartment and "staying for a short amount of time").

Craig argues that "Deputy Fleck had no prior knowledge of the CI and no reason to believe he was trustworthy." "When evaluating tips, courts are to make a practical, common-sense decision whether, given all the circumstances . . . including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Davis*, 711 N.W.2d at 848 (quotation omitted). Deputy Fleck verified much of the information the CI provided, including Craig's physical appearance, phone number, address, vehicle, and criminal history. *See State v. Holiday*, 749 N.W.2d 833, 841 (Minn. App. 2008) (stating that "the corroboration of even minor details lent credence to the information provided by the CI and bolstered the CI's reliability," and concluding that the corroboration of the suspects "name, nickname, physical description, gang affiliation, and vehicle information" bolstered the CI's reliability under the more demanding probable-cause standard).

Craig cites *State v. Cook*, 610 N.W.2d 664 (Minn. App. 2000), *review denied* (Minn. July 25, 2000), and argues that the CI in this case "failed to establish any sort of basis of knowledge for his blanket assertion that [he] sold narcotics in the 'Twin Cities Metro area.'" In *Cook*, this court held that the police lacked probable cause to arrest Cook because the CRI provided only a "description of Cook's clothing, physical appearance, vehicle, and present location," and "[t]hese details . . . fail[ed] to offer any explanation for the basis of the CRI's claim that Cook was selling drugs." 610 N.W.2d at 668. "The CRI never claimed that he had purchased drugs from Cook or that he had seen Cook selling drugs." *Id*. This court observed that the "police did no independent

14

corroboration other than to verify that the vehicle described by the CRI was parked in the YMCA lot and that the man leaving the YMCA and getting into the driver's side of the vehicle matched the description of Cook given to police by the CRI." *Id.* But Craig's argument is not persuasive because this court stated in *Cook* that the CRI's tip likely satisfied the lesser reasonable-suspicion standard that is at issue in this case. *See id.* at 669 (stating that the "police may have had 'reasonable suspicion' to legally stop and question Cook to ascertain his identity," and that "reasonable suspicion [is a] less demanding standard than probable cause and can be established with information that is different in quantity, content, or even reliability" (Citation omitted)).

In sum, because the police had a reasonable suspicion that Craig had illegal drugs in his apartment, his rights under the Minnesota Constitution were not violated.

**III.**

Craig argues that "without the evidence obtained through the unlawful dog sniff, the warrant application lacked probable cause and the evidence obtained as a result of the search must be suppressed." Because we have concluded that the dog sniff was lawful under both the United States and Minnesota Constitutions, Craig's probable-cause challenge to the search warrant fails.

**Affirmed.**