*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0190**

State of Minnesota,
Respondent,

vs.

Philip Lee Carlson,
Appellant.

**Filed March 14, 2016
Affirmed
Schellhas, Judge**

Hennepin County District Court
File No. 27-CR-11-29604

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Brittany D. Lawonn, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Michael W. Kunkel, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Worke, Presiding Judge; Schellhas, Judge; and Reyes, Judge.

UNPUBLISHED OPINION

**SCHELLHAS**, Judge

On appeal from his conviction of felony theft by swindle, appellant argues that the district court committed plain error that affected his substantial rights when instructing the jury on accomplice liability. Appellant also makes numerous pro se arguments. We affirm.

**FACTS**

Appellant Philip Lee Carlson and his wife Virginia Marie Carlson owned Sugarwoods Office Center LLC, which owned 49% of Amber Woods Office Center LLC.[1] In September 2006, Amber Woods and First Commercial Bank closed on a construction loan to build an office condominium (Amber Woods project). The loan agreement provided that loan funds would be disbursed over time in response to requests to pay for completed work on the Amber Woods project (draw requests) and supporting documents regarding completed work, including invoices and lien waivers from subcontractors.

Interspace, an entity owned by Philip Carlson and Virginia Carlson, was the general contractor for the Amber Woods project. In or around October 2007, the bank received draw request one from Interspace. Draw request one was unsigned; Amber Woods and Interspace were listed below the blank signature lines. Draw request one was accompanied by supporting documents including an invoice purportedly from Sundblad Construction (Sundblad) and a lien waiver signed by Virginia Carlson for Interspace and purportedly

---

[1] The remaining 51% of Amber Woods was owned by Hilloway East LLC, which was owned by Robert Roos, Michael Leuer, and James Fenning.

signed by John Sundblad for Sundblad. In reliance on draw request one and its supporting documents, the bank released $173,988.73 in loan funds; the funds were disbursed by a check payable to "Sunblad [sic] & Interspace." John Sundblad purportedly endorsed the check, and the funds were deposited into an Interspace account. Interspace subsequently issued a check, signed by Virginia Carlson, to "Sunblad [sic]" in the amount of $55,860.91.

In or around November 2007, the bank received draw request two from Interspace. Draw request two was signed by Philip Carlson for Interspace and Amber Woods. Draw request two was accompanied by supporting documents including an invoice purportedly from Sundblad and a lien waiver signed by Virginia Carlson for Interspace and purportedly signed by John Sundblad for Sundblad. The supporting documents also included an invoice purportedly from Alpine Landscape Inc. and a lien waiver signed by Virginia Carlson for Interspace and unsigned by any Alpine agent. In reliance on draw request two and its supporting documents, the bank made two distinct releases of loan funds: a $224,689.64 check whose payees were "Interspace & Sunbald [sic]," and a $38,126.25 check whose payees were "Interspace & Alpine." The larger check was endorsed by John Sundblad; the smaller check was endorsed "Interspace Logan Ryan, for Alpine." Both checks were deposited into an Interspace account. Interspace subsequently issued a check, signed by Virginia Carlson, to Sundblad in the amount of $121,686.57. Alpine received no portion of the released funds.

In or around January 2008, the bank received draw request three from Interspace. Draw request three was signed by Philip Carlson for Interspace and Amber Woods. Draw request three was accompanied by supporting documents including an invoice from Logan

3

Ryan Corporation, which was owned by Philip Carlson and Virginia Carlson, and a lien waiver signed by Virginia Carlson for Interspace and illegibly signed on behalf of Logan Ryan.[2] In or around February 2008, in reliance on draw request three and its supporting documents, the bank released $31,985 in loan funds; the funds were disbursed by a check whose payee was Logan Ryan. The check was endorsed "Logan Ryan Corporation," and the funds were deposited into a Logan Ryan account.

In or around May 2008, the bank received draw request four from Interspace. Draw request four was signed by Philip Carlson for Amber Woods and was signed by Virginia Carlson for Interspace and Amber Woods. Draw request four was accompanied by supporting documents including an invoice from Logan Ryan and a lien waiver illegibly signed on behalf of Logan Ryan.[3] In reliance on draw request four and its supporting documents, the bank released $164,522 in loan funds; the funds were disbursed by a check whose payee was Logan Ryan. The check was endorsed "partial" and "Logan Ryan Corp.," and the funds were deposited into a Logan Ryan account.

In or around July 2008, the bank received draw request five from Interspace. Draw request five was unsigned; Interspace, Amber Woods, Roos, Leuer, and Fenning were listed below the blank signature lines. Draw request five was accompanied by supporting documents including an invoice from Logan Ryan and a financial statement purportedly

---

[2] The lien waiver may have been signed "Rory Synstelien" on behalf of Logan Ryan. Synstelien, who is Virginia Carlson's son and Philip Carlson's stepson, testified that he had no association with Logan Ryan and did not sign the lien waiver.

[3] The lien waiver may have been signed "Rory Synstelien" on behalf of Logan Ryan. Synstelien testified that he did not sign the lien waiver.

4

from Palo Companies Inc. The bank released no loan funds in reliance on draw request five and its supporting documents because subcontractors had begun to file liens against the Amber Woods project. Work stopped on the Amber Woods project in late 2008 or early 2009.

In or around October 2010, Roos and an agent of the bank went to police and reported suspected fraud by Philip Carlson and Virginia Carlson. Police investigated and determined that Philip Carlson and Virginia Carlson had committed "some fraud . . . or some theft by swindle" in connection with the five draw requests. In September 2011, respondent State of Minnesota charged Philip Carlson with four counts of felony theft by swindle and one count of attempted felony theft by swindle, under Minn. Stat. § 609.52, subds. 2(4), 3(1) (2006); each count was charged with reference to Minn. Stat. § 609.05 (2006), the accomplice-liability statute.[4] Virginia Carlson was identically charged, and the district court granted the state's motion to join the cases against Philip Carlson and Virginia Carlson.

The district court conducted a consolidated jury trial in August 2014. The state presented evidence that the five draw requests and their supporting documents were fraudulent in that the Sundblad, Alpine, and Palo invoices/statements did not originate from those companies; the Sundblad and Palo invoices/statements overreported the work completed by and the amounts owed to those companies; the Logan Ryan invoices reflected

---

[4] Count one was based on draw request one; counts two and three were based on draw request two; count four was based on draw requests three and four; and count five was based on draw request five.

5

work that was not completed by that company and sought amounts that consequently were not owed to that company; and the lien waivers reflected payments that, in whole or in part, were not actually made to the companies whose waivers were sought. The state also presented evidence that each of the first four draw requests resulted in the bank's release of loan funds that ultimately came into the possession of Philip Carlson and Virginia Carlson. The jury found Philip Carlson and Virginia Carlson guilty as charged, and Philip Carlson and Virginia Carlson each were convicted of a single count (count one) of felony theft by swindle and sentenced to 21 months' imprisonment, with execution stayed for 5 years and 365 days' local confinement.

Philip Carlson appeals.[5]

## D E C I S I O N

### Accomplice-liability instruction

"[A] failure to object to jury instructions precludes review unless the appellant can show that there was a plain error affecting substantial rights." *Gulbertson v. State*, 843 N.W.2d 240, 247 (Minn. 2014). Such an error is grounds for reversal "only if it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. Taylor*, 869 N.W.2d 1, 15 (Minn. 2015) (quotations omitted). "An error is plain if it is clear or obvious; this means an error that violates or contradicts case law, a rule, or an applicable standard of conduct." *State v. Mosley*, 853 N.W.2d 789, 801 (Minn. 2014), *cert. denied*,

---

[5] We declined to consolidate this appeal with Virginia Carlson's appeal of her conviction. *State v. Philip Carlson*, No. A15-0190 (Minn. App. Oct. 13, 2015) (order). We therefore address Virginia Carlson's appeal separately. *State v. Virginia Carlson*, No. A15-0179, slip op. (Minn. App. Mar. 14, 2016).

135 S. Ct. 1185 (2015). "An error affects a defendant's substantial rights when there is a reasonable likelihood that the instruction had a significant effect on the jury verdict." *State v. Davis*, 864 N.W.2d 171, 178 (Minn. 2015). An appellant bears the heavy burden of proving that an erroneous jury instruction had a significant effect on the verdict. *State v. Wenthe*, 865 N.W.2d 293, 299 (Minn. 2015), *cert. denied*, 136 S. Ct. 595 (2015).

In this case, the district court instructed the jury on accomplice liability with regard to Philip Carlson:

> Liability for crimes of another. Defendant Philip Carlson is guilty of a crime committed by another person when he has intentionally aided the other person in committing it or has intentionally advised, hired, counseled, conspired with or otherwise procured the other person to commit it. Defendant Philip Carlson is guilty of a crime, however, only if the other person commits the crime. Defendant Philip Carlson is not liable criminally for aiding, advising, hiring, counseling, conspiring or otherwise procuring the commission of a crime unless some crime, including an attempt, is actually committed.

The court gave a nearly identical instruction with regard to Virginia Carlson. Philip Carlson did not object to these instructions, which tracked the language of the accomplice-liability statute. *See* Minn. Stat. § 609.05, subd. 1 ("A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime."). But the court also was required to

> explain to the jury that in order to find a defendant guilty as an accomplice, the jury must find beyond a reasonable doubt that the defendant knew his alleged accomplice was going to commit a crime and the defendant intended his presence or actions to further the commission of that crime.

7

*State v. Milton*, 821 N.W.2d 789, 808 (Minn. 2012). The court's failure to so explain is plain error. *State v. Kelley*, 855 N.W.2d 269, 277–78 (Minn. 2014). The state rightly concedes this point.

The issue before us is whether the district court's plain error affected Philip Carlson's substantial rights; that is, whether a reasonable likelihood exists that the jury's verdict would have been different had the court properly instructed the jury regarding accomplice liability. Philip Carlson argues that

> [t]hough the evidence demonstrated that each of the Carlsons signed documents and took actions that ultimately became components of a fraud perpetrated against [the bank], the state nevertheless had difficulty establishing that any of the individual acts by either of the [Carlsons] was undertaken with either (1) the knowledge that a crime was being committed, or (2) the intent that such an act would aid in its commission.

According to Philip Carlson, the state's purported difficulty establishing that he acted with knowledge of the crimes and intent to aid their commission shows that a reasonable likelihood exists that the jury would not have found him guilty had it been instructed properly under *Milton*.

But the state proved that in July 2007, Philip Carlson and Virginia Carlson complained that they had been "den[ied] . . . any type of payment that they requested" from the bank and that "they wanted to find a way . . . to get money through somebody else's invoice." On the same occasion, "[Philip Carlson and Virginia Carlson] talked about asking [John] Sundblad to put their fee onto his invoice and then [John] Sundblad could pay them for what they thought they were owed." About three months after Philip Carlson and Virginia Carlson made those statements, Interspace caused the first of five fraudulent draw

8

requests to be transmitted to the bank, and the first two fraudulent draw requests involved John Sundblad.

The state also proved that Philip Carlson and Virginia Carlson owned Interspace, acted on behalf of Interspace, "were the only ones submitting and putting together draw requests" in connection with the Amber Woods project, "knew all the specific line items" on the draw requests, "knew all the detail of the [draw requests and the supporting] documents," and "talked about the documents as if they had prepared them." Philip Carlson personally signed draw requests two, three, and four, and Virginia Carlson personally signed supporting documents in connection with draw requests one, two, three, and four and checks in connection with draw requests one and two. In connection with draw request two, Philip Carlson induced John Sundblad to endorse a check disbursing loan funds in an amount that was not owed to Sundblad; the check then was deposited into an Interspace account. And each of the first four draw requests resulted in the bank's release of loan funds that ultimately came into the possession of Philip Carlson and Virginia Carlson.

Moreover, Philip Carlson's defense was not that he did not know that Virginia Carlson was going to commit theft by swindle; neither was Philip Carlson's defense that he did not intend his presence or actions to further Virginia Carlson's commission of theft by swindle. Rather, Philip Carlson's defense was that "[t]here [wa]s no theft by swindle." Philip Carlson attempted to characterize the fraudulent draw requests as the result of "poor business practices," "very sloppy bookkeeping," and "less-than-meticulous attention to detail." This defense strategy was consistent with that of Virginia Carlson, including her

9

presentation of expert testimony by a certified public accountant that "more money went out for the [Amber Woods] project than what came in."

We look to supreme court caselaw for guidance here. In *Kelley*, the appellant challenged his conviction of first-degree aggravated robbery based on an unobjected-to jury instruction on accomplice liability. *Id.* at 272. The supreme court concluded that the district court plainly erred in "fail[ing] to explain the intentionally aiding element [of accomplice liability] as required by *Milton*." *Id.* at 275, 277–78. Yet the supreme court also concluded that "there is no reasonable likelihood that the erroneous jury instruction had a significant effect on the jury verdict because there is considerable evidence of [the appellant]'s guilt, and his defense did not focus on accomplice liability." *Id.* at 284. The court noted that "[the appellant] did not argue that he did not know the other person was going to commit the crime, or that he did not intend his presence to further the commission of the crime." *Id.*

Similarly in this case, the state presented strong evidence that Philip Carlson and Virginia Carlson formed and executed a plan to trick the bank into releasing loan funds and to gain possession of those funds. And Philip Carlson made no claim that he was unaware of Virginia Carlson's crimes or that he had no intent to aid Virginia Carlson's commission of the crimes; instead, he argued that no crimes were committed. Philip Carlson has not met his heavy burden to prove a reasonable likelihood that the jury would not have found him guilty had it been instructed properly under *Milton*. The district court's plain error therefore did not affect Philip Carlson's substantial rights and is not grounds for reversal.

***Pro se arguments***

*Sufficiency of the evidence*

"It is axiomatic that it is the State's burden to prove every element of the charged offense." *State v. Struzyk*, 869 N.W.2d 280, 289 (Minn. 2015). "The elements of theft by swindle are: (i) the owner of the property gave up possession of the property due to the swindle; (ii) the defendant intended to obtain for himself or someone else possession of the property; and (iii) the defendant's act was a swindle." *State v. Pratt*, 813 N.W.2d 868, 873 (Minn. 2012); *see also* Minn. Stat. § 609.52, subd. 2(4) (providing that a person commits theft who "by swindling, whether by artifice, trick, device, or any other means, obtains property or services from another person").[6] "The essence of a swindle is the defrauding of another of his property by deliberate artifice." *State v. Olkon*, 299 N.W.2d 89, 106 (Minn. 1980). "[P]ermanent deprivation [of the property] is not an element of theft by swindle." *Pratt*, 813 N.W.2d at 875 (quotation marks omitted). And the state need not prove that the swindler acted without claim of right to the property. *See State v. Ray*, 390 N.W.2d 843, 846–47 (Minn. App. 1986) (rejecting appellant's argument that he had a right to trick victims into paying him for legal services and concluding that swindle was complete "when appellant intentionally tricked [victims] into giving $10,000 for an appeal bond," reasoning that "[w]hether [victims] received legal services, either before or after

---

[6] Because Philip Carlson was convicted of *felony* theft by swindle, the state was required to prove an additional element: that "the value of the property or services stolen is more than $35,000." Minn. Stat. § 609.52, subd. 3(1). But Philip Carlson does not contest the sufficiency of the evidence to prove the value element of felony theft by swindle.

11

they gave the $10,000, is immaterial to the criminal charge because they gave the $10,000 for a bond, not in payment for legal services").

"A person is criminally liable for a crime committed by another if the person intentionally aids, advises, hires, counsels, or conspires with or otherwise procures the other to commit the crime." Minn. Stat. § 609.05, subd. 1. "'[I]ntentionally aids' includes two important and necessary principles: (1) that the defendant knew that his alleged accomplices were going to commit a crime, and (2) that the defendant intended his presence or actions to further the commission of that crime." *State v. McAllister*, 862 N.W.2d 49, 52 (Minn. 2015) (quotations omitted). "Intent generally is proved circumstantially, by inference from words and acts of the actor both before and after the incident." *State v. Cox*, 798 N.W.2d 517, 537 (Minn. 2011) (quotation omitted).

Philip Carlson makes various arguments that appear to attack the sufficiency of the circumstantial evidence to support his conviction of felony theft by swindle. We evaluate the sufficiency of circumstantial evidence using a two-step test. *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015), *cert. denied*, 136 S. Ct. 509 (2015). We first identify the circumstances proved, "defer[ring] to the fact-finder's acceptance of the proof of these circumstances and the fact-finder's rejection of evidence in the record that conflicts with the circumstances proved by the State." *Id.* Then we "examine independently the reasonable inferences that might be drawn from the circumstances proved." *Id.* "To sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of guilt." *Id.*

In our analysis of the jury-instruction issue, we already have identified the circumstances proved in this case. We conclude that these circumstances are consistent with the hypothesis that Philip Carlson intentionally aided or conspired with Virginia Carlson in each count of commission and attempted commission of theft by swindle. We further conclude that these circumstances are inconsistent with any rational hypothesis except that Philip Carlson intentionally aided or conspired with Virginia Carlson in each count of commission and attempted commission of theft by swindle. We therefore reject Philip Carlson's sufficiency-of-the-evidence arguments.

*Prosecutorial misconduct*

Philip Carlson also argues that the prosecutor committed misconduct by referring to the draw requests and their supporting documents as "false," "fake," and "fraudulent"; claiming that Philip Carlson and Virginia Carlson planned to swindle the bank; presenting false testimony and exhibits; and arguing in closing that "this case is not about how Philip [Carlson] and Virginia Carlson used the loan funds, nor is it about whether the defendants claim to have a right to the loan funds." "In reviewing a claim of prosecutorial misconduct, we first examine the challenged conduct to determine whether any error occurred." *State v. Mogler*, 719 N.W.2d 201, 211 (Minn. App. 2006). We have examined closely the challenged conduct and conclude that the prosecutor's arguments and presentation of evidence did not constitute error.

*Brady violation*

"A failure by the State to disclose material, exculpatory evidence justifies a new trial." *State v. Brown*, 815 N.W.2d 609, 622 (Minn. 2012) (citing *Brady v. Maryland*, 373

13

U.S. 83, 87–88, 83 S. Ct. 1194, 1196–97 (1963)). "To establish a *Brady* violation, it must be true that: (1) the evidence at issue is favorable to the accused, either because it is exculpatory or it is impeaching; (2) the evidence was willfully or inadvertently suppressed by the State; and (3) prejudice to the accused resulted." *Id.* "Whether a discovery violation occurred presents a question of law, which [appellate courts] review de novo." *State v. Colbert*, 716 N.W.2d 647, 654 (Minn. 2006).

Philip Carlson appears to argue that the state committed a *Brady* violation by delaying its subpoena of documents regarding the Amber Woods project from the Federal Deposit Insurance Corporation (FDIC documents) and by failing to more thoroughly investigate and disclose the financial details of the project. Philip Carlson generally asserts that the allegedly suppressed evidence is favorable to him, but he makes no attempt to identify particular evidence that is either exculpatory or impeaching. Moreover, he provides no authority for his argument that the timing of the state's subpoena and the scope of the state's investigation constitute suppression of evidence under *Brady*. Finally, while he baldly asserts that the alleged suppression was prejudicial, he does not attempt to explain how prejudice resulted. We conclude that Philip Carlson has failed to establish any element of a *Brady* violation.

*Right to testify*

"A defendant's right to testify is protected by the Due Process Clause of the United States Constitution and Minnesota law." *Andersen v. State*, 830 N.W.2d 1, 11 (Minn. 2013). "The defendant's waiver [of that right] must be knowingly and voluntarily made." *Id*. "The defendant has the burden of proving that he or she did not voluntarily and

14

knowingly waive the right to testify." *Id.* "Absent a finding to the contrary, [appellate courts] presume that the defendant waived the right to testify for the reasons stated on the record." *Id.*; *see also State v. Smith*, 299 N.W.2d 504, 506 (Minn. 1980) ("Without anything in the record suggesting otherwise, we must presume that the decision not to testify was made by defendant voluntarily and intelligently.")

Philip Carlson argues that the state "filed a second case of attempted theft by swindle against [him] days before trial as a virtual 'gag order' to prevent [him] from testifying on [his] own behalf under the threat of perjury and/or impeachment." But the record shows that, prior to Philip Carlson's waiver of his right to testify, the district court addressed him personally regarding the existence and substance of his testimonial rights. Philip Carlson affirmed that he understood his rights and that he had no questions about what the court had said. Philip Carlson also engaged in the following colloquy immediately prior to waiving his right to testify:

> THE COURT: Mr. Philip Carlson, have you had enough time to talk with your lawyer about this?
> PHILIP CARLSON: Yes.
> THE COURT: Has your lawyer answered all of your questions?
> PHILIP CARLSON: Yes.
> THE COURT: Okay. Then what is it you would like to do? Testify or not testify?
> PHILIP CARLSON: Not testify.
> THE COURT: Is it your own personal choice not to testify?
> PHILIP CARLSON: Yes.

Because nothing in the record suggests that Philip Carlson's waiver of his right to testify was coerced by the state or otherwise was not knowing and voluntary, we reject his argument to the contrary.

*Miscellaneous arguments*

Philip Carlson argues that he was entitled to dismissal of the indictment against him because the state failed to disclose exculpatory evidence to the grand jury. But Philip Carlson was charged by complaint, not by indictment. Philip Carlson identifies no deficiency in the complaint. Consequently, this argument warrants no further consideration.

Philip Carlson argues that the draw requests and their supporting documents were inadmissible under Minn. R. Evid. 408. That rule provides that

> [e]vidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

Minn. R. Evid. 408. The rule mandates exclusion in a civil suit of evidence of settlement negotiations regarding the claims underlying that suit; it has no application in this criminal case.

Philip Carlson argues that the district court erred in ruling that the FDIC documents not be used at trial. The court actually ruled that *the state* could not use the FDIC documents in its case in chief; Philip Carlson and Virginia Carlson, on the other hand, were given an additional week to review the FDIC documents for possible use in their defenses. In any event, Philip Carlson fails to explain why the court's ruling was erroneous. We therefore do not give further consideration to this general assignment of error. *See State v. Andersen*, 871 N.W.2d 910, 915 (Minn. 2015) ("An assignment of error based on mere assertion and

16

not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." (quotation omitted)).

Philip Carlson asserts that "alternative perpetrators committed the crime of theft by swindle." A district court may abuse its discretion by excluding evidence that an alternative perpetrator committed the crime for which the defendant is being prosecuted. *Davis*, 864 N.W.2d at 180–81. Yet Philip Carlson does not claim that the district court excluded any alternative-perpetrator evidence. Instead, Philip Carlson essentially raises a new defense for our consideration, asserting that Roos, Leuer, and Fenning are guilty of theft by swindle. This assertion is not cognizable on appeal. *Cf. State v. Porte*, 832 N.W.2d 303, 308–09 (Minn. App. 2013) (noting appellant's assertion that it is more likely that controlled substance belonged to alternative perpetrators, characterizing assertion as "essentially ask[ing] this court to reweigh the evidence," and declining to do so).

Philip Carlson appears to make a public-policy argument against his conviction, claiming that "if left to stand [the conviction] creates a *fatal defect* to civil law." Philip Carlson's failure to identify reversible error cannot be overcome by public-policy arguments. *See State v. Christenson*, 827 N.W.2d 436, 441 n.2 (Minn. App. 2012) ("Because this court is limited in its function to correcting errors it cannot create public policy." (quotation omitted)), *review denied* (Minn. Feb. 19, 2013).

Philip Carlson argues against restitution. Although the prosecutor initially argued for restitution at the sentencing hearing, the state ultimately did not seek a restitution order,

17

and the district court issued no restitution order. Here, Philip Carlson makes no allegation of error for our review.

Finally, Philip Carlson's pro se reply brief raises several issues, none of which were addressed in his counseled brief or in his lengthy principal pro se brief. "Failure to brief or argue an issue on appeal results in waiver of that issue on appeal." *Ouk v. State*, 847 N.W.2d 698, 701 n.7 (Minn. 2014), *cert. denied*, 135 S. Ct. 1429 (2015). "Issues not raised or argued in appellant's [principal] brief cannot be revived in a reply brief." *State v. Petersen*, 799 N.W.2d 653, 660 (Minn. App. 2011) (citing *State v. Yang*, 774 N.W.2d 539, 558 (Minn. 2009)), *review denied* (Minn. Sept. 28, 2011). We decline to address the issues raised in Philip Carlson's pro se reply brief because Philip Carlson forfeited their appellate consideration.

**Affirmed.**